# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 9, 2016         Decided May 17, 2016

No. 14–7041

GSS GROUP LTD., ALSO KNOWN AS
GLOBAL SECURITY SEALS GROUP LTD.,
APPELLANT

v.

NATIONAL PORT AUTHORITY OF LIBERIA
AND REPUBLIC OF LIBERIA,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:12–cv–00332)

*Stanley McDermott III*, *pro hac vice*, argued the cause for the appellant. *Charles B. Wayne* was with him on brief.

*Colleen E. Roh Sinzdak* argued the cause for the appellees. *Jessica L. Ellsworth* was with her on brief.

Before: HENDERSON, ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by Circuit Judge HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: GSS Group, Ltd. (GSS), a construction company incorporated in the British Virgin Islands and headquartered in Israel, appeals the district court's dismissal of its second attempt to confirm a $44 million arbitral award entered against the National Port Authority of Liberia (Port Authority) for breach of a construction contract. When GSS first tried to confirm the award, the district court found, and we affirmed, that it had no personal jurisdiction over the Port Authority. When GSS filed its second petition, it named not only the Port Authority but also the Republic of Liberia, which owns the Port Authority, as respondents. The district court again dismissed GSS's petition, finding that issue preclusion barred re-litigating its personal jurisdiction over the Port Authority and that GSS failed to demonstrate that Liberia was liable for the Port Authority's alleged breach. For the reasons stated below, we affirm.

## I. BACKGROUND

Although resolution of this case is ultimately straightforward, the history leading to our disposition is not. Three district court orders[1] and one opinion from this Court[2] have set out the relevant background but a refresher is nonetheless needed for completeness.

---

[1] *See GSS Grp. Ltd. v. Nat'l Port Auth. (GSS Grp. I)*, 774 F. Supp. 2d 134 (D.D.C. 2011) (order dismissing first petition); *GSS Grp. Ltd. v. Nat'l Port Auth. (GSS Grp. II)*, No. 09-cv-1322 (D.D.C. Aug. 10, 2011) (order denying GSS's motion to alter or amend judgment); *GSS Grp. Ltd. v. Republic of Liber. (GSS Grp. IV)*, 31 F. Supp. 3d 50 (D.D.C. 2014) (order dismissing second petition).

[2] *See GSS Grp. Ltd v. Nat'l Port Auth. (GSS Grp. III)*, 680 F.3d 805 (D.C. Cir. 2012).

## A. Factual Background

The contract dispute at issue has its genesis in the turmoil following Liberia's Second Civil War. After four years of conflict, two separate rebel groups besieged Monrovia, Liberia's capital, in 2003. Within months, Liberian President Charles Taylor was exiled and the separate political factions signed a Comprehensive Peace Agreement. The Peace Agreement created the National Transitional Government of Liberia, a power-sharing entity designed to govern the recovering nation until it could hold democratic elections. Monitoring and enforcing the Peace Agreement became the responsibility of the International Contact Group on Liberia (ICGL), a multi-national advisory board led by the United States and including members of the United Nations, the European Union, the Economic Community of West African States and the World Bank.

The Peace Agreement also created the Liberian Contract & Monopolies Commission (Commission) to combat the corruption and mismanagement that had plagued the nation. The Peace Agreement authorized the Commission to ensure that "all public financial and budgetary commitments entered into by the" National Transitional Government are "transparent, non-monopolistic and in accordance with the laws of Liberia and internationally accepted norms of commercial practice." Comprehensive Peace Agreement, art. XVII(2)(a). To accomplish its goal, the Commission promulgated Liberia's Interim Public Procurement Policy and Procedures (Interim Procedures), which set out ground rules for, *inter alia*, state procurement of contracts for goods and services.

During Liberia's transition period, revitalizing the war-ravaged Monrovian Port (Port) became a priority. The

responsibility of doing so fell to the Port Authority, a wholly Liberian-owned corporation that manages, operates and maintains all Liberian ports. Created as "a distinct juridical entity with the capacity to enter into contracts and to sue and be sued in its own name," *GSS Grp. IV*, 31 F. Supp. 3d at 55, the Port Authority functions "at some remove from the government itself," *GSS Grp. III*, 680 F.3d at 808. For instance, it enjoys expansive financial and administrative authority and has exclusive control over all funds it generates. Its Board of Directors is primarily comprised of Liberian government officials and individuals appointed by Liberia's president.

On June 9, 2005, the Port Authority awarded GSS a multi-million-dollar contract to build a container park at the Port. Although the Interim Procedures mandated that the Port Authority award such contracts through "open competitive bidding," Interim Procedures 3 (Joint App'x (J.A.) 535), the Port Authority did not do so. As a result, on June 23, 2005, the Commission informed the Port Authority that the GSS contract was invalid and reminded it that all contracts must result from competitive bidding.

Instead of conducting a bid, the Port Authority petitioned the Commission for a single-source exemption, which allows a Liberian entity to dispense with competitive bidding if, *inter alia*, "there is an urgent need" for the contract and "engaging in bid proceedings . . . is impractical due to unforeseeable circumstances." *Id.* at 12–13 (J.A. 544–45). The Port Authority urged the Commission that any further delay in construction of the container park could result in the Port's closure and that the contract would help the Port comply with the International Ship and Port Facility Security Code. The Commission granted the exemption on August 12, 2005, and the parties re-negotiated the contract 10 days later.

The GSS contract aroused the international community's interest. The ICGL reviewed the contract and came away with "deep concerns" about its validity and monetary value. Letter from ICGL to Charles Gyude Bryant, Chairman of Nat'l Transitional Gov't of Liber., at 1 (Oct. 19, 2005) (J.A. 220). It notified the National Transitional Government by letter dated October 19, 2005, stating that, in its view, the Commission should not have granted the Port Authority the exemption and that the contract represented poor value for money. Aware of the scrutiny, GSS and the Port Authority amended the contract again on October 28, 2005. Their efforts failed. On December 30, 2005, the National Transitional Government's Chairman directed the Port Authority to cancel the GSS contract. The letter stated:

> I have taken off considerable time to carefully review the analysis of my technical team regarding equitable benefits to all parties resulting from the contract entered into between the [Port Authority] and the GSS. Our evaluation shows that the contract as negotiated and concluded places the Port Authority in a grossly disadvantageous position for more than a decade. Additionally, the contract does not contribute in any material way to compliance with the [International Ship and Port Facility Security] regulations and as such *Security Qualification* of the Free Port of Monrovia still remains.
>
> I am therefore directing that the GSS contract be cancelled and the Port Authority work[] toward a more holistic management contract that will improve operational, financial and security efficiency levels. The sourcing of any

> managing team must be done through a competitive bidding process after proper terms of reference are agreed upon and approved by the . . . Commission and the technical committee of the [Economic Governance Steering Committee].[3] The GSS shall be free to submit an offer at that time.

Letter from Charles Gyude Bryant, Chairman of Nat'l Transitional Gov't of Liber., to D. Masuleng Coop, Chairman of Nat'l Port Auth. (Dec. 30, 2005) (J.A. 977). On January 3, 2006, the Port Authority sought reconsideration from the National Transitional Government. The record does not reflect whether the Port Authority's request prompted a response. On January 16, 2006, the National Transitional Government abdicated its power and Liberia's newly elected government assumed control.

On January 26, 2006, the Port Authority informed GSS, via letter, that it was cancelling the contract. A rapid volley of correspondence between GSS and the Port Authority ensued, culminating in a February 16, 2006 letter from the

---

[3] The Economic Governance Steering Committee (EGSC) was one of two organizations created in 2005 as part of an agreement between the ICGL and the National Transitional Government called the "Governance and Economic Management Assistance Program" (GEMAP). The GEMAP's goal "was to promote accountability and transparency in fiscal management by setting in place internal governmental controls and providing for international involvement, all while recognizing and preserving Liberian sovereignty." Aff. of O. Natty B. Davis II, Republic of Liber.'s Minister of State, ¶ 12 (J.A. 244). The EGSC, whose membership consisted of Liberian government officials as well as representatives from the United States (including the United States Ambassador to Liberia), the EU, the World Bank and other international stakeholders, was the body designed to provide the international involvement contemplated by the GEMAP.

Port Authority explaining that the Interim Procedures demand complete transparency and adherence to open bidding and concluding that the GSS contract fell well short of those standards. It further explained that the Commission only granted the single-source exemption because it mistakenly thought the contract was necessary to comply with international obligations and to avoid the Port's closure.[4] Because the exemption was mistakenly granted, the Port Authority considered the contract "null and void ab initio." *GSS Grp. IV*, 31 F. Supp. 3d at 56 (citation omitted).

On March 15, 2006, GSS invoked the contract's arbitration clause (which provided that disputes arising under the agreement were to be arbitrated in London and in accordance with the laws of England and Wales) against the Port Authority, but not against Liberia. Meanwhile, a separate Liberian governmental organization—the Liberian Public Procurement and Concession Commission[5]—sought a Liberian-court declaration that the contract, including the arbitration provision, was invalid. Because of the Liberian judicial proceedings, the Port Authority declined to participate in the London arbitration and GSS appointed the sole arbitrator. On February 8, 2008, the Liberian court found the

---

[4] According to the Port Authority, the Commission's mistake was caused by a $30,000 bribe that GSS paid the Port Authority's then-managing director to convince the Commission that an urgent need for the requested single-source exemption existed.

[5] Formed in 2005, the Liberian Public Procurement and Concession Commission's mission is "to ensure the economic and efficient use of public funds in public procurement and to ensure that public procurement and concession processes are conducted in a fair, transparent and non-discriminatory manner." Frequently Asked Questions about PPCC, Public Procurement & Concessions Commission, Gov. of the Republic of Liber., http://www.ppcc.gov.lr/content.php?sub=67&related=1&third=67&pg=sp (last visited May 9, 2016).

relevant portions of the contract unenforceable. Notwithstanding the Liberian court's decision, one month later, the arbitrator determined that he had jurisdiction of the dispute; in June 2008, he concluded that the Port Authority was liable for the cancellation and in May 2009, he found that GSS suffered damages in the amount of $44,347,260.00.

## B. GSS's First Petition To Confirm London Arbitral Award

On June 16, 2009, GSS filed a petition in the United States District Court for the District of Columbia to confirm the London arbitral award.[6] The Port Authority moved to dismiss the petition on the ground that, *inter alia*, it had no contact whatsoever with the United States (much less the District of Columbia) and therefore the district court lacked personal jurisdiction. GSS responded that the Port Authority, a wholly state-owned enterprise, was not a "person" within the meaning of the Due Process Clause and, accordingly, had no right to assert a personal-jurisdiction defense. *GSS Grp. I*, 774 F. Supp. 2d at 138.

The district court rejected GSS's argument, finding that, although a foreign *sovereign* is not a person under the Due Process Clause, the Port Authority "functions more like a

---

[6] Statutory subject matter jurisdiction of GSS's petition is based on the Federal Arbitration Act (FAA), 9 U.S.C. §§ 201 *et seq*, which codifies the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3. The Convention, in turn, obligates each contracting nation (including the United States) to "recognize [foreign] arbitral awards as binding and enforce them in accordance with" local law. *Id*. art. III. Because the United Kingdom is also a party to the Convention, the FAA provides U.S. courts with authority to enforce the London arbitral award (notwithstanding neither the arbitral award nor the GSS contract has any United States connection).

private corporation" and, accordingly, has due process rights. *Id.* at 141. Because GSS made no attempt to show that the Port Authority had any United States contacts, the district court dismissed GSS's petition for lack of personal jurisdiction. In so doing, the district court observed that, "[f]or unknown reasons," GSS declined to argue that the Port Authority and Liberia "are legally indistinguishable." *Id.* at 138–39.

GSS moved for reconsideration under Rule 59(e). In its motion, GSS argued for the first time that the Port Authority was Liberia's agent and that it was entitled to discovery to demonstrate the same. The district court found that GSS had waived the arguments by failing to raise them earlier.

GSS appealed the dismissal and, on May 25, 2012, we affirmed *in toto*. As a threshold matter, we agreed that GSS had waived its agency and jurisdictional-discovery arguments. We then rejected the only argument GSS had preserved—that a foreign, state-owned entity has no due process rights—and affirmed the district court's dismissal because GSS had failed to identify "*any* connection" between the United States and the Port Authority. *GSS Grp. III*, 680 F.3d at 817 (emphasis in original).

### C. GSS's Second Petition To Confirm London Arbitral Award

On March 1, 2012 (one day before oral argument here in GSS's appeal of the dismissal of its initial petition), GSS filed in district court a second petition to confirm the award. This time, however, GSS named Liberia as the sole respondent;[7]

---

[7] As noted above, *see supra* n.6, the FAA provided the subject matter jurisdiction for GSS's first position, which named the Port Authority as the sole respondent. Because GSS named Liberia, a foreign sovereign, as

three weeks later, it amended the petition to add the Port Authority. The thrust of GSS's second petition was that the Port Authority was Liberia's agent and, accordingly, Liberia was liable for the $44 million London award. Because Liberia, as a sovereign, may not assert a personal-jurisdiction defense, GSS believed that its second petition cleared the hurdle that blocked its first. It also served both the Port Authority and Liberia with discovery requests to clarify their *inter se* connection.

The district court was not persuaded. It began with the Port Authority's amenability to suit, concluding that its dismissal of GSS's first petition on the "no personal jurisdiction" ground precluded GSS's second attempt to sue the Port Authority in federal court. Despite GSS's contention that the district court did not resolve its agency argument when it dismissed GSS's first petition, the district court concluded that collateral estoppel barred *issues*—not simply specific *arguments*—that had been necessarily decided in earlier proceedings. And because "GSS enjoyed every

the respondent in its second petition, GSS argued that the district court had subject matter jurisdiction under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330 *et seq*. Under the FSIA, a foreign state, as well as its agencies and instrumentalities, is presumed to enjoy sovereign immunity from suit in U.S. courts unless one of several statutory exceptions applies. *See id.* § 1604. One exception—the only one applicable here—is the "arbitration exception," which provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is brought [to enforce an arbitration agreement or award that] is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." *Id.* § 1605(a)(6)(B); *see also* 28 U.S.C. § 1330(a) (district court has subject matter jurisdiction of "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity").

opportunity to rely on a theory of agency when it earlier litigated the issue of personal jurisdiction," *GSS Grp. IV*, 31 F. Supp. 3d at 61, the district court applied the issue preclusion bar.

The district court also held that it had no subject matter jurisdiction of Liberia. It noted that GSS had to overcome the presumption that "government instrumentalities established as juridical entities distinct and independent from their sovereign"—like the Port Authority—"should normally be treated as such." *Id.* at 62 (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 626–27 (1983)). To do so, GSS had to demonstrate either that the Port Authority was Liberia's agent or that treating the Port Authority as distinct from Liberia would perpetuate fraud or injustice. The district court found that GSS had demonstrated neither.

To support its agency argument, GSS proffered that Liberia controlled the Port Authority's board of directors; that Liberia had assumed a portion of the Port Authority's outstanding debt; that, when the Port Authority contracted with a third party to replace the GSS contract in 2010, several Liberian government officials, including the Liberian president, executed the new agreement; and that Liberia forced the Port Authority to cancel the contract. The district court found that GSS's first three arguments were either foreclosed by *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843 (D.C. Cir. 2000), or not probative of Liberia's control over the Port Authority in 2005–06. It also rejected the argument that the directive to the Port Authority to cancel the contract created an agency relationship. In so doing, it noted that the Port Authority independently negotiated and executed the contract and that Liberia's

cancellation order was an act of government regulation, not commandeering.

Having found that the Port Authority was not Liberia's agent, the district court made quick work of GSS's fraud or injustice argument. It first recognized that the requisite injustice occurs if, for example, a sovereign uses an instrumentality to shield itself from costs or risks, to unjustly enrich itself or to defeat a statutory policy. It then concluded that the "single sentence" GSS offered in support of its argument did not suffice to demonstrate injustice. *GSS Grp. IV*, 31 F. Supp. 3d at 68.

The district court dismissed GSS's petition in its entirety but did not address GSS's discovery requests before it did so. GSS timely appealed.[8] Our review of the district court's issue preclusion determination, *see Hall v. Clinton*, 285 F.3d 74, 80 (D.C. Cir. 2002), and its dismissal for lack of subject matter jurisdiction, *see Transamerica Leasing, Inc.*, 200 F.3d at 847, is *de novo*. We review its denial of jurisdictional discovery for abuse of discretion. *See Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1089 (D.C. Cir. 1998).

---

[8] On February 21, 2015, we held this case in abeyance pending the United States Supreme Court's disposition of *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015). When the Supreme Court granted certiorari in *OBB Personenverkehr AG*, a potential issue was "[w]hether, for purposes of determining when an entity is an 'agent' of a 'foreign state,' " the FSIA's definition of "agency," the factors set out in *Bancec* "or common law principles of agency" govern. Pet. for Writ of Cert. at i, *OBB Personenverkehr AG v. Sachs* (No. 13-1067), 2014 WL 890906 at *i (Mar. 5, 2014). The Supreme Court ultimately failed to reach the issue. *See OBB Personenverkehr AG*, 136 S. Ct. at 395.

## II.  ANALYSIS

On appeal, GSS argues that: (1) the district court had subject matter jurisdiction of Liberia: the Port Authority was Liberia's agent and failure to hold Liberia liable for the Port Authority's contract cancellation would permit a miscarriage of justice; (2) the district court had personal jurisdiction of the Port Authority by virtue of its jurisdiction of Liberia and the district court erred by finding that issue preclusion barred the claim and (3) the district court abused its discretion by dismissing GSS's petition before allowing GSS to conduct jurisdictional discovery.  GSS's appeal turns on whether the National Transitional Government's December 30, 2005 cancellation order justifies setting aside our general rule that "agencies and instrumentalities of a foreign nation are presumed to be separate from each other and from the foreign state."  *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 440 (D.C. Cir. 1990).

### A.  REPUBLIC OF LIBERIA

GSS's primary argument is that Liberia is liable for the Port Authority's cancellation of the contract and, accordingly, the district court had subject matter jurisdiction of it pursuant to the FSIA's arbitration exception.  To satisfy its burden,[9] GSS must demonstrate either that Liberia controlled the Port Authority "so extensively" that the Port Authority became Liberia's agent or that treating the Port Authority as legally separate from Liberia would allow fraud or injustice. *Transamerica Leasing, Inc.*, 200 F.3d at 848.  GSS argues that it satisfies both exceptions, relying almost exclusively on

---

[9] *See Foremost-McKesson, Inc.*, 905 F.2d at 447 ("It is . . . clear that the *plaintiff* bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship." (emphasis in original)).

the National Transitional Government's instruction to cancel the contract.

## 1. Principal/Agency Relationship

Our resolution of GSS's agency argument begins and ends with our *Transamerica Leasing, Inc.* opinion. In that case, we explained that a plaintiff may demonstrate that an agency relationship exists in one of two ways. The first occurs if a sovereign asserts "complete domination" of a subsidiary. *Id.* The second results from "ordinary agency principles," which do not require a showing of "*complete* dominion." *Id.* at 849 (emphasis added). GSS makes no real attempt to demonstrate that it satisfies the former, instead focusing its efforts on the latter.

In *Transamerica Leasing, Inc.*, we recognized that explaining the degree of control necessary to find agency is challenging. *See id.* Despite the caselaw's "often . . . confusing results," we discerned four prerequisites. *Id.* We held that no agency relationship arises unless (1) the sovereign makes plain its desire for the instrumentality to act on the sovereign's behalf; (2) the instrumentality agrees to so act; (3) the sovereign has final say over matters delegated to the instrumentality and (4) the sovereign wields its power more directly than voting a majority of the instrumentality's stock or choosing the instrumentality's board of directors.[10] *Id.* at 849–50. Based on these factors, GSS's argument reduces to the following: Liberia ordered the Port Authority to cancel the contract and the Port Authority obliged;

---

[10] *See also* RESTATEMENT (SECOND) OF AGENCY § 1 ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.").

therefore, Liberia had the requisite authority over the Port Authority to make the latter its agent.[11]

Superficially, GSS has a point—the National Transitional Government's directive left the Port Authority with no discretion to ignore the cancellation order. But in *Transamerica Leasing, Inc*., we recognized that a government can wield power not only "as shareholder" but also as "regulator." 200 F.3d at 851.[12] And read in context, it is plain that the National Transitional Government was exercising its regulatory authority when it ordered the Port Authority to cancel the GSS contract—not commandeering the Port Authority in a way that erased the separate juridical boundaries between it and Liberia.

Recall the situation in Liberia during which the contract emerged. Between 2003 and 2006, Liberia (and, especially, Monrovia) was struggling to recover not only from a four-year civil war but also from a history of government corruption and financial mismanagement. To aid the recovery, the Commission promulgated Interim Procedures, which required state-owned corporations to obtain goods and services through competitive bidding. When the Port Authority failed to do so, the Commission immediately advised the Port Authority that the procedural violation

---

[11] *See also* Appellant's Br. 9 ("In short, when Liberia directed the [Port Authority] to cancel the Project Agreement, Liberia acted as principal, the [Port Authority] was its agent, and that principal-agent relationship—manifest in the cancellation of the Project Agreement—satisfies the *Bancec* standard.").

[12] *See also Transamerica Leasing, Inc.*, 200 F.3d at 851 ("[W]e cannot say that requiring a shipping company to obtain governmental approval for the sale of vessels represents the exercise of Venezuela's authority as shareholder rather than its exercise of governmental power in the ordinary course of regulation.").

rendered the contract invalid; in addition, the ICGL undertook its own review. The Commission's grant of a single-source exemption did not erase the ICGL's "deep concerns" about the contract's validity and worth and these concerns prompted the ICGL to inform the National Transitional Government that the Commission should not have granted the exemption and that the contract as a whole disproportionately favored GSS at the Port Authority's expense. Letter from ICGL to Charles Gyude Bryant, Chairman of Nat'l Transitional Gov't of Liber., at 1 (Oct. 19, 2005) (J.A. 220). With the ICGL's guidance in mind, the National Transitional Government then instructed the Port Authority to cancel the contract.

The National Transitional Government's December 30, 2005 letter informed the Port Authority that it had not complied with a legal obligation, that it had not satisfied the requirement for an exemption therefrom and that it was to cancel the contract. This action is the quintessential function of a government regulator. Granted, one of the criticisms of the contract was "commercial," Appellant's Br. 20, but in our view, the concern that the contract placed "the Port Authority in a grossly disadvantageous position" was an outgrowth of Liberia's broader regulatory goal of remedying past financial mismanagement. Letter from Charles Gyude Bryant, Chairman of Nat'l Transitional Gov't of Liber., to D. Masuleng Coop, Chairman of Nat'l Port Auth. (Dec. 30, 2005) (J.A. 977). In any event, the National Transitional Government also ordered the contract's cancellation because it did "not contribute in any material way to compliance with" the Port's international responsibilities. *Id.* Ensuring compliance with international obligations, and correcting a

state-owned instrumentality when it fails to do so, is a hallmark of a sovereign acting in its regulatory capacity.[13]

The National Transitional Government's directive to the Port Authority to "work[] toward a more holistic management contract that will improve operational, financial and security efficiency levels" emphasized the importance of revitalizing the Port in a cost-effective manner, *id.*; moreover, its instruction that "[t]he sourcing of any managing team must be done through a competitive bidding process after proper terms of reference are agreed upon and approved by the . . . Commission and the technical committee of the EGSC" reminded the Port Authority of its responsibility to follow the Interim Procedures, *id.* Critically, the National Transitional Government noted that GSS remained free to submit a bid for the contract so long as it complied with all applicable procedures. Allowing GSS the opportunity to secure the contract (through a competitive bid) underscores that Liberia's interest was in ensuring that the Port Authority procured goods and services in accordance with the Interim

---

[13] *See, e.g.*, 46 U.S.C. § 42101 ("[T]he Federal Maritime Commission shall prescribe regulations affecting shipping in foreign trade, . . . to adjust or meet general or special conditions unfavorable to shipping in foreign trade, . . . which arise out of or result from laws or regulations of a foreign country or competitive methods, pricing practices, or other practices employed by owners, operators, agents, or masters of vessels of a foreign country."); *id.* § 42106(5) ("If the Federal Maritime Commission finds that conditions unfavorable to shipping in foreign trade as described in section 42101 of this title exist, the Commission may . . . take any [remedial] action the Commission finds necessary and appropriate to adjust or meet any condition unfavorable to shipping in the foreign trade of the United States.").

Procedures and not in "wresting control of the . . . contract from the" Port Authority. Appellant's Br. 21.[14]

GSS discusses (but does not emphasize) other factors that, in its view, demonstrate Liberia's control of the Port Authority. None changes our conclusion. First, GSS argues that the Port Authority's board of directors was controlled by Liberia but we have held that state stock ownership and board control is an inherent part of state-owned instrumentalities and, standing alone, does not create an agency relationship. *See Transamerica Leasing, Inc.*, 200 F.3d at 851. Next, GSS points out that Liberia absorbed $32.2 million of the Port Authority's debt burden but we have held that a sovereign's financial aid to an instrumentality is part and parcel of normal state ownership. *Id.* at 852. Finally, GSS points to a 2010 agreement that replaced the cancelled GSS contract, which agreement was executed by several Liberian government officials, including the Liberian president. But the 2010 agreement sheds no light on the degree to which Liberia controlled the Port Authority when the Port Authority entered into and then cancelled the GSS contract in 2005–06.

---

[14] GSS argues that "the principal Liberian regulator, the . . . Commission . . . had approved the Project Agreement before Liberia cancelled it, indicating that Liberia was not acting in any regulatory capacity when it did so." Appellant's Br. 10. But the Commission initially advised the Port Authority that the contract was invalid because it was not awarded through competitive bidding. The National Transitional Government also cited the Port Authority's failure to comply with the competitive-bidding requirement when it ordered the contract's cancellation; the only difference between its position and the Commission's earlier position was that the National Transitional Government also concluded that the contract did not qualify for a single-source exemption.

## 2.  Fraud or Injustice

GSS also argues that respecting the boundaries between Liberia and the Port Authority would perpetuate fraud or injustice.  It relies on the Fifth Circuit's opinion in *Bridas S.A.P.I.C. v. Government of Turkmenistan (Bridas I)*, which held that a sovereign can be liable for its instrumentality's acts if the sovereign completely controlled the instrumentality "with respect to the transaction at issue" and exercised its dominion to commit a "fraud or wrong."  345 F.3d 347, 359 (5th Cir. 2003).  In GSS's view, Liberia dominated the Port Authority "with respect to" the contract and the Port Authority's cancellation was a "remediable wrong." Appellant's Br. 31–32.  This argument is without merit.  The Fifth Circuit explained that the requisite "wrong" must constitute either "fraud" or "misuse of the corporate form to promote injustice," *Bridas S.A.P.I.C. v. Gov't of Turkm. (Bridas II)*, 447 F.3d 411, 416–17 (5th Cir. 2006), and not simply a run of the mill alleged contractual breach.  This case is not the "exceptional case[]" to which *Bridas I* may apply. *Bridas II*, 447 F.3d. at 416.

For the foregoing reasons, we affirm the district court's dismissal of the claims against Liberia for lack of subject matter jurisdiction under the FSIA.

## B.  PORT AUTHORITY

GSS also argues that issue preclusion does not bar its claims against the Port Authority because its claims against Liberia differ from its claims against the Port Authority and jurisdiction over Liberia necessarily confers jurisdiction over the Port Authority.  Based on our conclusion that Liberia is *not* subject to suit in a United States court, GSS's argument regarding the Port Authority fails.  We note, however, that the district court's issue preclusion analysis is plainly correct.

Preclusion applies if a later argument "is related to the subject-matter and relevant to the issues that were litigated and adjudicated previously, so that it could have been raised." *Hall*, 285 F.3d at 81 (quoting *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 257–58 (D.C. Cir. 1992) (emphasis omitted)); *see also Yamaha Corp.*, 961 F.2d at 254 ("[O]nce an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case." (emphases in original)). GSS could have raised the agency argument in its first petition; it eventually *did* raise the argument but too late to avoid waiver. Accordingly, we again affirm the district court's dismissal of GSS's petition against the Port Authority.

## C. JURISDICTIONAL DISCOVERY

Finally, GSS offers two sentences in support of its argument that the district court erred by dismissing its petition before allowing jurisdictional discovery. We are correspondingly brief in concluding that, without more, GSS's two-sentence claim does not suffice and, thus, the district court committed no abuse of its wide discretion.

For the foregoing reasons, we affirm the district court's dismissal of GSS's petition.

*So ordered.*