MILLETT, Circuit Judge, concurring: While I disagreed with the panel order, I recognize that my colleagues labored hard under extremely pressured conditions to craft a disposition that comported with their considered view of the law’s demands. Fortunately, today’s decision rights a grave constitutional wrong by the government. Remember, we are talking about a child here. A child who is alone in a foreign land. A child who, after her arrival here in a search for safety and after the government took her into custody, learned that she is pregnant. J.D. then made a considered decision, presumably in light of her dire circumstances, to terminate that pregnancy. Her capacity to make the decision about what is in her best interests by herself was approved by a Texas court consistent with state law. She did everything that Texas law requires to obtain an abortion. That has been undisputed in this case. What has also been expressly and deliberately uncontested by the government throughout this litigation is that the Due Process Clause of the Fifth Amendment fully protects J.D.’s right to decide whether to continue or terminate her pregnancy. The government—to its credit—has never argued or even suggested that J.D.’s status as an unaccompanied minor who entered the .United States without documentation reduces or eliminates her constitutional right to an abortion in compliance with state law requirements. Where the government bulldozed over constitutional lines was its position that— accepting J.D.’s constitutional right and accepting her full compliance with Texas law—J.D., an unaccompanied child, has the burden of extracting herself from custody if she wants to exercise the right to an abortion that the government does not dispute she has. The government has insisted that it may categorically blockade exercise of her constitutional right unless this child (like some kind of legal Houdini) figures her own way out of detention by either (i) surrendering any legal right she has to stay in the United States and returning to the abuse from which she fled, or (ii) finding a sponsor—effectively, a foster parent—willing to take custody of her and to not interfere in any practical way with her abortion decision. That is constitutionally untenable, as the en banc court agrees. Settled precedent from Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), to Whole Woman’s Health v. Hellerstedt, — U.S. -, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016), establishes that the government may not put substantial and unjustified obstacles in the way of a woman’s exercise of her right to an abortion pre-viability. The government, however, has identified no constitutionally sufficient justification for asserting a veto right over J.D. and Texas law. Judge Kavanaugh’s dissenting opinion claims that the court has somehow broken new constitutional ground by authorizing “immediate abortion on demand” by “unlawful immigrant minors” (Judge Kavanaugh’s Dissent Op. 752). What new law? It cannot be J.D.’s status as an undocumented immigrant because the government has accepted that her status does not affect her constitutional right to an abortion, as Judge Kavanaugh’s opinion acknowledges on the next page (Dissent Op. 752). Accordingly, in this litigation, J.D., like other minors in the United States who satisfy state-approved procedures, is entitled under binding Supreme Court precedent to choose to terminate her pregnancy. See, e.g., Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). The court’s opinion gives effect to that concession; it does not create a “radical” “new right” (Judge Kavanaugh Dissent Op. 752) by doing so.[1] Beyond that, it is unclear why undocumented status should change everything. Surely the mere act of entry into the United States without documentation does not mean that an immigrant’s body is no longer her or his own. Nor can the sanction for unlawful entry be forcing a child to have a baby. The bedrock protections of the Fifth Amendment’s Due Process Clause cannot be that shallow. Abortion on demand? Hardly. Here is what this case holds: a pregnant minor who (i) has an unquestioned constitutional right to choose a pre-viability abortion, and (ii) has satisfied every requirement of state law to obtain an abortion, need not wait additional weeks just because she—in the government’s inimitably ironic phrasing—“refuses to leave” its custody, Appellants’ Opp’n to Reh’g Pet. 11. That sure does not sound like “on demand” to me. Unless Judge Kavanaugh’s dissenting opinion means the demands of the Constitution and Texas- law. With that I would agree. 1. Sponsorship The centerpiece of the panel order (and now Judge Kavanaugh’s dissenting opinion at 2-3) was the conclusion that forcing J.D. to continue her pregnancy for multiple more weeks is not an “undue burden” as long as the sponsorship search is undertaken “expeditiously.” Panel Order at 1. The panel order then treated its ordered eleven-day delay as just such an expedi-tiousprocess. But that starts the clock long after the horses have left the gate. The sponsorship search has already been underway for now-almost seven weeks. Throughout all of that time, the government was under a statutory obligation to find a sponsor if one was available. See 8 U.S.C. § 1232(c)(2). None materialized. Tacking on another eleven days to an already nearly seven-week sponsorship hunt—that is, enforcing an almost nine week delay before J.D. can even start again the process of trying to exercise her right—is the antithesis of expedition. A nine-week waiting period before litigation can start or resume, if adopted by a State, would plainly be unconstitutional. Cf. Whole Woman’s Health, 136 S.Ct. at 2318 (striking restrictions on abortion providers as unduly burdensome, noting in part “clinics’ experiences since the admitting-privileges requirement went into effect of 3-week wáit times”) (citations omitted). For very good reason, the sponsorship process is anything but expeditious. The sponsor is much like a foster parent, someone who chooses to house and provide for a child throughout her time in the United States, and who promises to ensure her appearance at all immigration proceedings. To protect these acutely vulnerable children from trafficking, sexual exploitation, abuse, and neglect, Congress requires the Department, of Health and Human Services to be careful in its review and restrictive in who can apply. See 8 U.S.C. § 1232. To that end, agency regulations provide that potential sponsors must either be related to J.D. or have some “bona fide social relationship” with the child that “existed before” her arrival in the United States.[2] On top of that, the panel’s order did not say that, at the end of its eleven days, J.D. could terminate her pregnancy if no sponsor were found. Quite the opposite: The order just stopped everything—except, critically, the continuation of J.D.’s pregnancy—until October 31st, at which time J.D. would have to restart the litigation all over again unless a sponsor was lucked upon. There is nothing expeditious about the prolonged and complete barrier to J.D,’s exercise of her right to terminate her pregnancy that the panel order allowed the government to perpetuate. Nor was any constitutionally sound justification for the order’s imposition of eleven more days on top of the already elapsed seven weeks ever advanced by the government. In fact, the government (i) never requested a stay to find a sponsor; (ii) never asked for a remand; (iii) never suggested in briefing or oral argument that there was any prospect of finding a sponsor at all, let alone finding one in the next eleven days or even in the foreseeable future; (iv) never even hinted, since no family member has been approved as a sponsor, that a non-family member could be identified, vetted, and take custody of J.D. within eleven days; and (v) never made any factual or legal argument contending that the already-seven-week-long- and-counting sponsorship process was an “expeditious” process or the type of short-term burden that could plausibly pass muster under Supreme Court precedent to bar an abortion. All the government argues with respect to sponsorship was that its flat and categorical prohibition of J.D.’s abortion was permissible because she could leave government custody if a sponsor were found or she surrendered any claim of legal right to stay here and voluntarily departed. Oral Arg. 12:35; 24:30-25:15. Custody, the government insists, is' the unaccompanied child’s problem to solve. A detained, unaccompanied minor, however, has precious little control over the sponsorship process. The Department of Health and Human Services is statutorily charged with finding, vetting, and approving sponsors. See 8 U.S.C. § 1232(c); 6 U.S.C. § 279. So the government’s position that J.D. cannot exercise her constitutional right unless the government approves a sponsor imposes a flat prohibition on her reproductive freedom that J.D, has no independent ability to overcome. Nor does sponsorship bear any logical relationship to J.D.’s decision to terminate the pregnancy. Because J.D. has obtained a judicial bypass order from a Texas court that allows her to decide for herself whether an abortion is- in her own best interests, a sponsor would have no ability to control or influence J.D.’s decision. See Texas Family Code § 33.003(i-3). Accordingly, finding a sponsor and allowing J.D. to exercise her unchallenged constitutional right are not mutually exclusive. The two can and should proceed simultaneously. Judge Kavanaugh’s dissenting opinion (at 755) suggests .that it would be good to put J.D. “in a better place when deciding whether to have an abortion.” That, however, is not any argument the government ever advanced. The only value of sponsorship identified by the government was that sponsorship, like voluntary departure from the United States, would get J.D. and her pregnancy out of the government’s hands. In any event, even, if sponsorship, as Judge Kavanaugh supposes, might be more optimal in a policy sense, J.D. has already made her decision, and neither the government nor the dissenting opinion identifies a constitutionally sufficient justification consistent with Supreme Court precedent for requiring J.D. to wait for what may or may not be a better environment. The dissenting opinion further assumes that J.D. is different because she lacks a “support network of friends and family.” Judge Kavanaugh’s Dissent Op. 755. Unfortunately, the central reason for the bypass process is that pregnant girls and women too often find themselves in dysfunctional and sometimes dangerous situations—such as with sexually or physi-eally abusive parents and spouses—in which those networks have broken down. See Texas Family Code § 33.003(i-3) (authorizing bypass when the court finds that “the notification and attempt to obtain consent would not be in the best interest of the minor[]”). It thus would require a troubling and dramatic rewriting of Supreme Court precedent to make the sufficiency of someone’s “network” an added factor in delaying the exercise of reproductive choice even after compliance with all state-mandated procedures. “Voluntary” departure is not a constitutionally adequate choice either given both the life-threatening abuse that J.D. claims to face upon return, and her potential claims of legal entitlement to remain in the United States. See Sealed Deck; 8 U.S.C. § 1101(a)(27)(J) (special immigrant juvenile status); 8 C.F.R. § 204.11.[3] Notably, while presenting a legal argument that relied heavily on voluntary departure to defend its abortion prohibition, government counsel was unable to confirm at oral argument whether or how voluntary departure actually works for unaccompanied minors over whom the government is exercising custody. See Oral Arg. 28:15-28:50; cf. 6 U.S.C. § 279(b)(2)(B) (restricting the release of unaccompanied minors on their own recognizance). The government has put nothing in the record to suggest that it is in the practice of putting children on airplanes all alone and just shipping them back to abusive and potentially life-endangering situations. 2. Facilitation The government argues that it need not “facilitate” J.D.’s decision to terminate her pregnancy. But the government is engaged in verbal alchemy. To “facilitate” something means “[t]o make (an action, process, etc.) easy or easier; to promote, help forward; to assist in bringing about (a particular end or result).”[4] This case does not ask the government to make things easier for J.D. The government need not pay for J.D.’s abortion; she has that covered (with the assistance of her guardian ad litem). The government need not transport her at any stage of the process; J.D. and her guardian ad litem have arranged for that. Government officials themselves do not even have to do any paperwork or undertake any other administrative measures. The contractor detaining J.D. has advised that it is willing to handle any necessary logistics, just as it would for medical appointments if J.D. were to continue her pregnancy. The government also admitted at oral argument that, in light of the district court’s order, the Department of Health and Human Services does not even need to complete its own self-created internal “best interests” form. See Oral Arg. 31:40-33:15. So on the record of this case, the government does not have to facilitate—make easier—J.D.’s termination of her pregnancy. It just has to not interfere or make things harder. The government’s suggestion of sponsorship as a facilitation-free panacea also overlooks that it would require substantial governmental effort and resources for J.D. to be placed into the hands of a sponsor who must enter into an agreement with the government and is responsible for ensuring the minor’s appearance at all immigration proceedings.[5] While after expending all of its resources to find, vet and approve the transfer, the government’s ongoing ties to sponsors are presumably less than for a grantee, the government has put no facts in the record or any argument as to why that difference in degree should be constitutionally sufficient. In any event, transferring J.D. into the custody of the guardian ad litem to obtain the abortion would require far less use of governmental resources and personnel and far less facilitation. The government’s desire to have as little to do as possible with J.D.’s exercise of her constitutional right while in custody thus seems erratic. The government’s claim that it does not think that an abortion is in J.D.’s best interests does not work either. The judicial bypass already put that best interests decision in J.D.’s hands. On top of that, the government does not even claim that it is making an individualized “best interests” judgment in forbidding J.D.’s abortion. It is simply supplanting her legally authorized best interests judgment with its own categorical position against abortion— which is something not even a parent or spouse or State could do. Only the big federal government gets this veto, we are told. The government unquestionably is fully entitled to have its own view preferring the continuation of pregnancy, and to even require the disclosure of information expressing that view. But the government’s mere opposition to J.D.’s decision is not an individualized “best interests” judgment within any legally recognized meaning of that term, and its asserted categorical bar to abortion is without constitutional precedent. 3. Abuse of Discretion Review In resolving this case, it must be remembered that this case arises on abuse-of-discretion review of a district court’s injunctive order. See, e.g., Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). And the expedition with which the panel and now the en banc court have acted underscores that time is a zero-sum matter in this case. J.D. is already into the second trimester of her pregnancy, which means that, as days slip by, the danger that the delayed abortion procedure poses to her health increases materially. We are told that waiting even another week could increase the risk to J.D.’s health, the potential complexity of the procedure, and the great difficulty of locating an abortion provider in Texas.[6] The sealed declaration filed in this case attests that a compelled • return. to her country at this time would expose her to even more life-threatening physical abuse. The irreparable injury to J.D. of postponing termination of her pregnancy—the weekly magnification of the risks to her health and the ever-increasing practical barriers to obtaining -an abortion in Texas—have never been factually contested by the government. J.D.’s counsel has advised, and the government has not disputed, that she is on the cusp of having to travel hundreds of miles to obtain an abortion. See Appellee’s Opp’n to Appellants’ Mot. for a Stay Pending Appeal 9 (representing that, as of October 19, 2017, depending on which doctor is available, it may be that J.D.’s “only .option next week would be to travel hundreds of miles to a more remote clinic”); Reh’g Pet. 5; supra note 6. Likewise, at no time before the district court or the panel did the government’s briefing or oral argument dispute J.D.’s-claim of severe child abuse or ask for fact fin,ding on that claim. On the other..,side of the balance, the government asserts only its opposition to an abortion by J.D. as an unaccompanied, minor in the custody of a Department of Health and Human Services grantee. That is an acutely selective form of resistance since the government acknowledges it would not apply were J.D. to turn 18 and be moved to Immigration and Customs Enforcement custody or were she a convicted criminal in Bureau of Prisons custody. Oral Arg. 9:20-11:45. Under current governmental policy and regulations, those women are permitted to terminate their pregnancies.[7] Given that dissonance ⅛ the government’s position, .the balancing of interests weighs heavily in J.D.’s favor. In short, I fully agree with the en banc court’s decision to deny the government’s motion for a stay and to remand, for further expeditious proceedings and any appropriate-fact finding, especially, in light of the factual disputes surfaced for the first time in the rehearing papers. Because J.D.’s right to an abortion under the Due Process Clause is unchallenged and because J.D. has done everything that Texas law requires (and more) to obtain an abortion, the government bore the burden of coming forward with a constitutionally sufficient justification for flatly forbidding termination of her pregnancy. The government’s mere-hope that an unaccompanied, abused child would make the problem go away for it by either (i) surrendering all of -her legal rights and leaving the United States, or (ii) finding a sponsor the .government itself could never find is not a remotely constitutionally sufficient reason for depriving J.D. of any control over this most intimate and life-altering decision. The court today correctly recognizes that J.D.’s unchallenged right under the Due Process Clause affords this 17-year-old a modicum of the dignity, sense of self-worth, and control ovér her own destiny that life seems to have so far denied her. . Because at no point in its briefing or oral argument in this court or the district court did the government dispute that J.D. has a constitutional right to obtain an abortion, the government has forfeited any argument to the contrary. See, e.g., Koszola v. FDIC, 393 F.3d 1294, 1299 n.1 (D.C. Cir. 2005), In fact, at oral argument, government counsel affirmed, in response to a direct question, that the argument was waived in this case. Oral Arg. 17:50; see, e.g., GSS Group Ltd. v. National Port Auth. of Liberia, 822 F.3d 598, 608 (D.C. Cir. 2016). . Office of Refugee Resettlement, Section 2: Safe and Timely' Release from ORR Care, available at https://www.acf,hhs.gov/orr/ resource/children-entering-the-united-states-unaccompanied-section-2 (last visited Oct. 24, 2017) ("In the absence of sufficient evidence of a bona fide social relationship with the child and/or the child’s family that existed before the child migrated to the United States, the child will not be released to that individual.’’) (emphases added). . While the government now objects that J.D. has not previously identified on which statutory basis she would seek relief from removal, Appellants’ Opp’n to Reh’g Pet. 5-6, 14,' J.D. has argued all along that her exercise of her unchallenged right under the Due Process Clause to an abortion could not be conditioned on her ”giv[ing] up her opportunity to be reunited with family here in the United States, or forcing her to return to her home country and abuse.” Appellee's Opp’n to Appellants’ Mot. for a Stay Pending Appeal 18; see PL’s Reply in Supp. of Mot. for TRO 6 ("The government should not be allowed to use her constitutional right to access abortion as a bargaining chip to trade for immigration status [.]”). While she had not yet cited to particular statutory provisions, that presumably is because the government has not yet initiated removal proceedings. . See Oxford English Dictionary Online (“facilitate” def. 1(a)), http://www.oed.com/view/ Entry/67460?redirectedFrom=facilitate#eid (last visited Oct. 24, 2017). . See Office of Refugee Resettlement, Section 2.8.1: After Care Planning, available at https:// www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2 (last visited Oct. 24, 2017). . Oral Arg. 1:13:45-1:15:10 (Counsel for J.D.: "Texas law requires counseling at least 24 hours in advance of the procedure by the same doctor who is to provide the abortion. Because of the limited availability of doctors to provide abortions in Texas, the same doctor is not always at the facility in south Texas. So, for example, the doctor that provided the counseling yesterday to J.D. is there today and on Saturday, but is not the same doctor who is there next week. So next week, there is a different doctor there on Monday and Tuesday, so if J.D. were allowed to have the abortion next week, she would have to be, unless this court declares otherwise, * * * counseled by this different doctor there on Monday and wait 24 hours to have the abortion on Tuesday. * * * [After Tuesday October 24, 2017], we are looking at the following week. The do'ctor that is there Thursday, Friday and Saturday, the following week * * * [is the doctor that only performs abortions at 15.6. weeks]. And we are very concerned that she is on the cusp, so even if she is able to go riext week, she may be past the limit for that particular doctor."); Reh'g Pet. 4-5; Appellee’s Opp’n to Appellants' Mot. for a Stay Pending Appeal 3; see Williams v. Zbaraz, 442 U.S. 1309, 1314-1315, 99 S.Ct. 2095, 60 L.Ed.2d 1033 (1979) (Stevens, J., sitting as Circuit Justice) (evidence of an increased risk of "maternal. morbidity and mortality” supports a claim of irreparable injury); Linda A. Bartlett, et at, Risk Factors for Legal Induced Abortion-^-Related Mortality in the United States, 103:4 Obstetrics & Gynecology 729 (April 20.04) (relative risk from abortion increases 38% each gestational week); Cates, W. Jr, Schulz, K.F., Grimes, D.A., Tyler, C.W. Jr., ’The Effect of Delay and' Method Choice on the Risk of Abortion Morbidity, Family Planning Perspectives 1977; 9:266, 273 (”[X]f a woman delays beyond the eighth week up to 10 weeks, the major morbidity rate is 0.36, which is 57 percent higher than her risk at eight or fewer weeks, Similarly, if she delays her abortion procedure until the 11-12-week interval, she increases her relative risk of major morbidity by 91 percent.”). . See ICE Guidelines, Detention Standard 4.4, Medical Care, available at https://www.ice. gov/doclib/detentionstandards/2011/medicaL care_women.pdf; 28 C.F.R. § 551.23.