# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 13, 2020          Decided July 28, 2020

No. 19-7087

TIG INSURANCE COMPANY, AS SUCCESSOR BY MERGER TO
INTERNATIONAL INSURANCE COMPANY AND INTERNATIONAL
SURPLUS LINE INSURANCE COMPANY,
APPELLANT

v.

REPUBLIC OF ARGENTINA, AS SUCCESSOR TO CAJA NACIONAL
DE AHORRO Y SEGURO AND CAJA NACIONAL DE AHORRO Y
SEGURO,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-mc-00129)

*Mark N. Bravin* argued the cause for appellant. With him on the briefs was *Theresa B. Bowman*.

*David A. Edelstein* argued the cause for appellees. With him on the brief were *Christopher Taggi* and *Charles M. Asmar*.

Before: TATEL and PILLARD, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  TIG Insurance Company sought to satisfy a long-pending judgment by attaching a building that the Republic of Argentina listed for sale in the District of Columbia.  The Foreign Sovereign Immunities Act (FSIA) prevents parties from executing against the property of foreign states in the United States unless the property falls into one of the statute's enumerated exceptions.  *See* 28 U.S.C. § 1609.  A prerequisite common to those exceptions is that the property be "used for a commercial activity" in the United States.  *Id*. § 1610(a).  Three days after TIG filed its emergency motion for attachment-related relief and a writ of execution, Argentina removed the property from the market.  The district court concluded that the property was immune from execution because Argentina's removal meant the property would not be "used for a commercial activity" at the time the court's writ would issue.  TIG contends the district court erred in looking only to the use of the property at the time of its order.  We hold that whether a property is "used for a commercial activity" depends on the totality of the circumstances existing when the motion for a writ of attachment is filed, not when the writ would issue.  We accordingly vacate and remand for further proceedings consistent with this opinion.

## BACKGROUND

Beginning in 1979, Argentina (through its predecessor-in-interest, a state-owned commercial insurance company called Caja Nacional) incurred debts under reinsurance contracts ultimately payable to TIG Insurance Corporation.  First in 2000 (through its own predecessor-in-interest), and again in 2017, TIG sought and ultimately obtained commercial arbitral awards against Argentina for failure to pay under the reinsurance contracts.  TIG confirmed those arbitral awards in

the Northern District of Illinois in 2001 and 2018.  Together, those awards are now worth more than $33 million.  Despite the parties' various efforts to reach a settlement over the last fifteen years, Argentina has yet to pay TIG any of the money owed.

In 2018, TIG learned that Argentina was planning to sell real estate in the District of Columbia.  Several decades ago, Argentina used the property, located at 2136 R Street Northwest, to house both diplomats and commercial tenants. *See NML Capital, Ltd. v. Republic of Argentina*, No. 04-cv-0197 (CKK), 2005 WL 8161968, at *1, *4, *14 (D.D.C. Aug. 3, 2005).  A creditor sought to attach the property in the early 2000s.  *Id*. at *1.  In the ensuing litigation, the district court noted that, "since 1997, the building has been uninhabited and in a state of disrepair with heavy restoration cost estimates." *Id*. at *4.  The property remains uninhabited today; Argentina says that it still stores some diplomatic files there.

On September 25, 2018, after Argentina had received multiple offers to buy the property, TIG registered its judgments from the Northern District of Illinois in the District of the District of Columbia, *see* 28 U.S.C. § 1963, and simultaneously filed an omnibus motion for emergency relief, attachment-related relief, and a writ of execution on the property.  Three days later—before the matter had even been assigned to a judge—Argentina took the property off the market.  The district court then denied TIG's motion for emergency relief, concluding that "a property is immune from attachment unless it is 'used for a commercial activity' at the time a writ of attachment issues."  *TIG Ins. Co. v. Republic of Argentina*, No. 18-mc-0129 (DLF), 2019 WL 3017618, at *1-2 (D.D.C. July 10, 2019) (quoting 28 U.S.C. § 1610(a)).  TIG timely appealed the district court's denial.  Our review is *de novo*.  *See, e.g.*, *Bennett v. Islamic Republic of Iran*, 618 F.3d

19, 21 (D.C. Cir. 2010); *FG Hemisphere Assocs., LLC v. Republique du Congo*, 455 F.3d 575, 583-84 (5th Cir. 2006).

## ANALYSIS

### A. Legal Framework

In enacting the FSIA, "Congress established . . . a comprehensive framework for resolving any claim of sovereign immunity." *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 141 (2014) (internal quotation marks omitted). That framework "confers on foreign states two kinds of immunity." *Id*. at 142; *see generally Walters v. Indus. & Comm. Bank of China, Ltd.*, 651 F.3d 280, 286-89 (2d Cir. 2011). The first and more familiar is "jurisdictional immunity," according to which "a foreign state shall be immune from the jurisdiction of the courts of the United States . . . except as provided in sections 1605 to 1607." 28 U.S.C. § 1604. The second is "execution immunity," which further protects foreign sovereigns by ensuring that, in the event of an adverse judgment, the sovereign's property in the United States "shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter." *Id*. § 1609. To enforce an award against a foreign state in the United States, a party must therefore establish both that the foreign state is not immune from suit and that the property to be attached or executed against is not immune. Importantly, execution immunity is not itself jurisdictional—unlike jurisdictional immunity. *See Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 482 (D.C. Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018). Execution immunity confers only a "default presumption" against execution against a foreign

sovereign's U.S. property that the "judgment creditor must defeat at the outset." *Id*. (internal quotation marks omitted).

In suits involving the attachment of a foreign sovereign's property, section 1610(a) governs how that "default presumption" may be overcome. Creditors must satisfy the two general requirements outlined in the opening language of that section and fit their claim into one of the seven enumerated exceptions to the otherwise applicable immunity codified in section 1609. The two general requirements and the specific exception invoked in this case are as follows:

> (a) The [1] property in the United States of a foreign state, as defined in section 1603(a) of this chapter, [2] used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

> [. . .]

>> (6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement[.]

28 U.S.C. § 1610(a); *see also, e.g.*, *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 247 (5th Cir. 2002) (noting the two "statutory criteria" of § 1610(a)).

The only issue before us is whether the second general requirement of section 1610(a)—that the property be "used for a commercial activity in the United States"—is met. The first

requirement is satisfied because there is no dispute that the building at 2136 R Street NW is Argentinian property in the United States. And it is uncontested that at least one of the judgments confirming one of TIG's arbitration awards satisfies the sixth enumerated exception, allowing attachment where the movant relies on a "judgment . . . based on an order confirming an arbitral award rendered against the foreign state." 28 U.S.C. § 1610(a). All we must decide is how a district court is to determine whether the property is one "used for a commercial activity" here.

As a preliminary matter, Argentina contends that we need not resolve even that narrow question because TIG has taken contrary positions in the district court and before this court, thereby forfeiting both the argument it made below and the one it now advances. *See generally* Argentina Br. 31-36. According to Argentina, TIG asked the district court to evaluate whether the property was "used for a commercial activity" at the time of filing, but now argues that the court should have examined the totality of the circumstances surrounding the property to make that determination.

We see no forfeiture here. TIG's arguments speak to different questions, both of which must be answered to resolve this case. First, at what moment in time should a district court assess whether a property is one "used for a commercial activity"? And, second, what circumstances should a district court examine to make that determination? As explained below, we agree with TIG on both counts: Courts should determine whether a property is "used for a commercial activity" based on the totality of circumstances at the time of filing.

**B.    District Courts Should Determine Whether a Property Is "Used for a Commercial Activity" at the Time of Filing**

We begin with the question of timing.  Argentina argues, and the district court agreed, that the phrase "used for a commercial activity" means that the property must "be in use for a commercial purpose at the time a writ of attachment and execution issues."  Argentina Br. 9; *see also TIG Ins. Co.*, 2019 WL 3017618, at *2 (requiring ongoing use for a commercial purpose at the "moment that a court makes [its] immunity determination").  By contrast, TIG argues that district courts are to "examin[e] the state of the record at the time of filing" to make this determination.  TIG Br. 42.

TIG's time-of-filing approach best accords with the text and purpose of the FSIA.    Under the "comprehensive framework" that the FSIA created, "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text.  Or it must fall."  *NML*, 573 U.S. at 141-42.  Stripped to the pertinent essentials, the text at issue here states that "[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune."  28 U.S.C. § 1610(a).  Argentina's primary argument in support of its time-of-writ position is that "used for a commercial activity" operates in this sentence as a "passive phrase with an implicit 'is,'"—referring to property that *is* used for a commercial activity—and therefore requires "use for a commercial activity in the present context." Argentina Br. 16.

The text does not support Argentina's time-of-writ rule for several reasons:

First, as Argentina's resort to an "implicit" tense makes clear, the text is anything but clear as to what tense it envisions.

Nothing in the language of this provision offers any clue as to whether "is used" or "was used" is the better reading. Moreover, as explained in greater detail below, we do not think any tense at all is to be associated with this phrase, which appears to operate as an adjective characterizing the type of property that may be attached. At a minimum, therefore, the text does not clearly dictate the reading that Argentina advances.

Second, even were we to accept Argentina's contention that the text implicitly references current use, Argentina does not support its further contention that what counts as the present time for purposes of that assessment is the moment the court would issue its writ. A statute's use of the present tense ordinarily refers to the time the suit is filed, not the time the court rules. For example, in considering whether plaintiffs have shown that a foreign corporation operates as an instrumentality of a foreign sovereign, the Supreme Court has held that the "plain text . . . requires that instrumentality status be determined at the time suit is filed" because the text "is expressed in the present tense." *Dole Foods Co. v. Patrickson*, 538 U.S. 468, 478 (2003); *see also Bennett*, 618 F.3d at 26 (Garland, J., concurring) ("Given the statute's use of the present tense, I would hold that [its protection] against attachment applies to property . . . at the time the writ of attachment is filed."). Because litigation proceeds based on facts as alleged in a complaint, it makes sense that the time the complaint is filed is the presumptive temporal touchstone.

That practicality points to a third, related obstacle to Argentina's time-of-writ rule, which is that it would require departing from the usual rules governing civil litigation, according to which district courts generally assess facts at the time of filing. In the context of determining diversity jurisdiction, for example, jurisdiction "is determined by the

condition of the parties at the commencement of the suit." *Anderson v. Watts*, 138 U.S. 694, 702-03 (1891); *see also Grupo Dataflux v. Atlas Global Grp.*, 541 U.S. 567, 570-71 (2004). Similarly, in determining whether the amount-in-controversy requirement is satisfied, courts do not consider changes that occur after removal to federal court. *See, e.g.*, *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 295 (1938). And, as noted, district courts determine how to rule on a motion to dismiss by "looking to the facts existing when" the complaint is filed. *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993). Argentina replies that these examples generally involve jurisdictional requirements, and execution immunity is not jurisdictional in this circuit. Argentina Br. 26-27. But nothing about that distinction supports adopting an unfamiliar time-of-writ rule for assessing commercial use. Indeed, at oral argument, counsel for Argentina was unable to point to a single example where we have adopted such a rule in any area of law. *See* Oral Arg. Rec. 14:18-15:50.

Fourth, given the FSIA's general definition of "commercial activity," Argentina's reading of the phrase "used for a commercial activity" creates a separate textual problem. The statute defines "commercial activity" to mean "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d); *see also, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 150 (3d Cir. 2019). By requiring that the property's commercial use occur when the court issues its writ, Argentina essentially reads out of the statutory definition its coverage of a "particular commercial transaction or act." As TIG explains, given the impossibility of anticipating with precision when a court might rule, "[r]equiring commercial activity to remain ongoing until an unspecified future time-of-writ[] necessarily requires evidence of *continuous and ongoing* commercial activity." TIG Br. 44.

The district court conceded that that this consequence was one casualty of its time-of-writ rule, but suggested it was "reasonable to conclude that Congress did not intend to invoke both definitions each time it referenced the term 'commercial activity' in the FSIA." *TIG Ins. Co.*, 2019 WL 3017618, at *4. That reasoning, while perhaps tenable in isolation, cannot prevail against an alternate reading that gives full effect to both definitions.

Argentina responds that a time-of-filing rule runs into two textual problems of its own. First, Argentina points to the Ninth Circuit's definition of "use" in this provision to mean "active employment." *See* Argentina Br. 16 (quoting *Af-Cap, Inc., v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088 (9th Cir. 2007) (*Af-Cap II*)). But that interpretation does not speak to the question of timing here: A property could equally be in "active employment" at the time of filing or at the time of writ. And, in any event, the Ninth Circuit in *Af-Cap II* adopted that definition only to answer questions unrelated to the issue before us, including whether the statute's passive construction covers use by an entity other than the foreign sovereign (no) or property that was merely generated by, or has some general nexus with, a commercial activity (also no). *See Af-Cap II*, 475 F.3d at 1087, 1091, 1093. Argentina actively employed its property for a commercial activity (namely, putting it up for sale), so there is no question that these facts satisfy the Ninth Circuit's interpretation, such as it is. But the fundamental point is that the issue here is not addressed by the portion of *Af-Cap II* that examines the definition of the word "use." And, as discussed below, when the Ninth Circuit did answer the question posed here, it adopted a totality-of-the-circumstances inquiry. *See Af-Cap II*, 475 F.3d at 1091; *see also Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 369 & nn.7-8 (5th Cir. 2004) (*Af-Cap I*).

Second, Argentina contrasts the introductory language in section 1610(a) with the language used in one of the enumerated exceptions, which permits attachment where "property *is or was* used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(2) (emphasis added); *see* Argentina Br. 17, 21-22. As an initial matter, we note that this is not an apples-to-apples comparison: The introductory portion of section 1610(a) lays out general requirements for any property that may be attachable under any exception, whereas section 1610(a)(2) specifies the details of one exception. And, as discussed above, Congress referred in section 1610(a) to "property used for a commercial activity," not, as Argentina would have it, to property that *is* "used for a commercial activity," so the contrast Argentina sees with "is or was" in section 1610(a)(2) is absent.

In any case, the "is or was" specification in section 1610(a)(2) is best read as making "double sure," *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting *Fla. Health Scis. Ctr., Inc. v. HHS*, 830 F.3d 515, 520 (D.C. Cir. 2016)), that property that itself forms the basis of a claim would be attachable. As the House Report accompanying the FSIA emphasized, the "language 'is or was used' in paragraph (2) contemplates a situation where property may be transferred from the commercial activity which is the subject of the suit in an effort to avoid the process of the court." H.R. Rep. No. 94-1487, at 28 (1976). Congress' choice to emphasize the reach of the second exception does not mean that Congress intended the general scope of attachable property under section 1610 to be narrower. Indeed, the most recent Restatement of Foreign Relations Law of the United States uses the very language to which Argentina points in section 1610(a)(2) as descriptive of the ambit of *section 1610(a)* as a whole: "[P]roperty of states may be attached" under the FSIA "if it is (or was) used in commercial activity." Restatement

(Fourth) of the Foreign Relations Law of the United States § 464 cmt. c (Am. Law Inst. 2020).

The lack of textual basis for Argentina's proffered time-of-writ rule suffices to reject it. But the broader purpose of the FSIA further confirms that the time-of-filing rule is the better reading. Congress enacted the FSIA to "protect the rights of both foreign states and litigants in United States courts." 28 U.S.C. § 1602. Congress cannot have intended a rule that would allow a foreign sovereign unilaterally to thwart an otherwise valid attachment simply by removing property from the market or otherwise pausing commercial activity after a creditor files suit. Were we to adopt Argentina's time-of-writ rule, foreign sovereigns would have every incentive to halt any commercial use of a property as soon as a creditor sought to attach it, and to draw out proceedings to delay the issuance of a writ until it had been able to do so. As the Third Circuit has explained, "[N]arrowing the temporal inquiry to the day the writ is executed unnecessarily leaves room for manipulation," for instance by "allow[ing] parties to avoid execution by freezing assets or otherwise ceasing commercial use." *Crystallex*, 932 F.3d at 150. A time-of-filing rule avoids such gamesmanship by ensuring that post-filing maneuvering by foreign sovereigns will not affect the result.

Argentina does not deny that such manipulation is possible, instead arguing that any concern about such a result "flows from the incorrect starting premise that enforcement of judgments against foreign states should be identical to enforcement of judgments against private individuals." Argentina Br. 24. But holding that a foreign sovereign enjoys execution immunity only to the extent that the FSIA provides does not reduce it to nothing. The FSIA affords immunity to property that is not "used for a commercial activity." Argentina's preferred rule would place extraordinary burdens

on the parties and the district court to speculate about factual circumstances at the precise moment when the court's writ would issue. We fail to discern any intent on Congress' part to guarantee such a result.

### C. District Courts Should Examine the Totality of the Circumstances to Determine Whether a Property Is "Used for a Commercial Activity"

Concluding that courts should assess the facts at the time of filing does not answer what facts bear on whether a property is one "used for a commercial activity." 28 U.S.C. § 1610(a). In defending its time-of-writ rule, Argentina argues that the only relevant consideration is the property's use at the moment when the court issues its writ; past uses and continuing availability for future commercial use are irrelevant to the inquiry. *See, e.g.*, Argentina Br. 7-9, 15-18. By contrast, TIG's "totality-of-the-circumstances" approach would "take[] into account all uses of the Property, including recent past uses, as well as whether the foreign state has manipulated the Property's use or status to evade attachment and execution, and whether the Property remains available for commercial use." TIG Br. 24. We join several other circuits in holding that district courts should look to the totality of the circumstances to make this determination.

Once again, that result follows from the text and purpose of the FSIA. The line between sovereign acts and commercial acts is a distinction central to the FSIA. The statute seeks to ensure that foreign states may not be sued in United States courts for their sovereign acts while providing that they—like other commercial actors—may be held accountable here for their commercial activities. Congress' enacted findings and declaration of purpose make that goal explicit: States were not to be "immune from the jurisdiction of foreign courts insofar

as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." 28 U.S.C. § 1602. The requirement in section 1610(a) that the property be one "used for a commercial activity," *id*. § 1610(a), should be interpreted consistently with the goal to ensure that only a foreign sovereign's "commercial property" is attachable, *id*. § 1602. For that reason, the phrase is best interpreted as an adjectival phrase characterizing the kind of property that may be attached. As the Fifth Circuit has captured it, the question a court must ask is whether the property at issue is "the type of foreign property the FSIA was designed as a shield to protect." *Af-Cap I*, 383 F.3d at 371.

Indeed, just as it would be odd to look only to the property's use at the moment when the court issues its writ, so, too, would it be odd to confine a district court's examination to the property's use at the exact moment when the suit was filed. That approach would again encourage gamesmanship—but on the part of plaintiffs rather than foreign sovereigns. In either case, an artificially narrow lens allows one-time or aberrational uses to dictate the fate of the property. The Fifth Circuit illustrates this point through the hypothetical of an "airplane owned by a foreign government and used solely to shuttle a foreign head-of-state back and forth for official visits," but that "had been used on rare occasions for commercial activities— for example, . . . to fill in for a displaced plane in the foreign country's commercial fleet." *Id*. at 369 (quoting *Conn. Bank*, 309 F.3d at 253). The Fifth Circuit concluded that it would "strain reason" to hold that the airplane could be attached and sold in execution of a judgment due to those aberrational commercial uses. *Id*. Extending the hypothetical, the fact that a suit is filed during one of the "rare occasions" when the property has a commercial use similarly should not be dispositive. Rather, the better conclusion is to hold that a

"foreign property retains its immunity protection where its commercial uses, considered holistically and in context, are bona fide exceptions to its otherwise noncommercial use." *Id*. at 370.

In requiring the district court to consider the broader context of the property at issue, we join our colleagues in three other circuits. Under the Fifth Circuit's "more holistic approach," courts "should include an examination of the uses of the property in the past as well as all facts related to its present use, with an eye toward determining whether the commercial use of the property, if any, is so exceptional that it is an out of character use for that property." *Id*. at 369 (footnote and internal quotation marks omitted). This holistic approach gives due weight to past uses of the property in order to accurately characterize what kind of property is at issue: "[C]onsideration of evidence of past use is an indispensable part of a court's FSIA inquiry" because a "court forbidden to consider how property has been used in the past would be hard-pressed to accurately determine whether the predominant use of that property is commercial or sovereign." *Id*. at 369 n.7. Reasoning along similar lines, the Third Circuit recently concluded that this "totality-of-the-circumstances inquiry seems more appropriate" to ensure that gamesmanship does not distort the result. *Crystallex*, 932 F.3d at 150 (citing *Af-Cap I*, 383 F.3d at 369).

In addition, the Ninth Circuit has adopted its own version of a totality-of-the-circumstances test, noting that the execution-immunity "determination will be made by considering the use of the property in question in a straight-forward manner, with a proper appreciation of the fact that the further removed the property is from the referenced commercial transaction, the less likely it is that the property was used *for* that transaction." *Af-Cap II*, 475 F.3d at 1091.

Indeed, the Ninth Circuit embraces a broader inquiry than even the Fifth Circuit.  Whereas the Fifth Circuit had expressed its "reservations about defining property use as commercial in nature solely by reference to past single and/or exceptional commercial uses," *Af-Cap I*, 383 F.3d at 369, the Ninth Circuit "decline[d] . . . to incorporate the Fifth Circuit's articulated 'reservations'" because, in its view, "attempting to quantify the number of commercial uses associated with the property, or to embark upon characterizing property use as exceptional or unexceptional, would unnecessarily complicate the determination to be made under § 1610(a)," *Af-Cap II*, 475 F.3d at 1091 (quoting *Af-Cap I*, 383 F.3d at 369).  We do not choose between these slightly different approaches, leaving it to district courts to elaborate, case-by-case, how they find particular factual circumstances to bear on a property's asserted commercial use.

Argentina raises three primary objections to a totality-of-the-circumstances inquiry.  First, it seeks to rebut the circuit consensus by reference to cases, most notably from the Second Circuit, that appear to place potentially dispositive weight on the property's use at the time the writ would issue.  *See* Argentina Br. 17-19.  In particular, the Second Circuit has noted that property subject to attachment and execution "must be 'property in the United States of a foreign state' *and* must have been 'used for a commercial activity' *at the time* the writ of attachment or execution is issued."  *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) (quoting 28 U.S.C. § 1610(a)); *see also Export-Import Bank of the Republic of China v. Grenada*, 768 F.3d 75, 84 (2d Cir. 2014) (considering the property's commercial status "when the writ of attachment or execution issues").

But across its cases in this area, the Second Circuit appears to be concerned with ensuring that purely *future* uses are not

projected to satisfy the requirements of § 1610(a). As TIG explains, the best reading of *Aurelius* is that, "*by the time that a writ is issued*, some commercial use *must already have been* active." TIG Br. 30. That reading accords with other language from *Aurelius* explaining that "[s]ection 1610(a) does not say that the property in the United States of a foreign state that '*will* be used' or '*could potentially* be used' for a commercial activity in the United States is not immune from attachment or execution," but instead makes clear that the property "must be 'used for a commercial activity in the United States' before it is susceptible to attachment and execution." 584 F.3d at 130; *see also id.* at 131 (noting that Argentina "*had not used* the funds for any commercial activity at the time of attachment" (emphasis added)). Similarly, in *EM Ltd. v. Republic of Argentina*, the Second Circuit found inadequate an attempt to attach funds that "*could have* been used to repay the Republic's debts to the IMF" where there was no evidence of "either actual use or designation for use" in that manner. 473 F.3d 463, 484 (2d Cir. 2007); *see also id.* ("The plain language of the statute suggests that the standard is actual, not hypothetical, use."). Such concerns are assuaged by a totality-of-the-circumstances inquiry, under which a property would not be found to be commercial if it had never yet been used for commercial activity.

Second, Argentina argues that the Fifth Circuit, too, places potentially dispositive weight on a property's commercial status at the time of the writ when determining whether the foreign sovereign's property is "in the United States," as the other general condition of section 1610(a) requires. *See* Argentina Br. 21 (citing *F.G. Hemisphere*, 455 F.3d at 589). But the requirement that the property be in the United States goes directly to the domain of the court's remedial order itself. *Cf. NML*, 573 U.S. at 142 (noting that a "writ of execution . . . can be served anywhere within the state in which the district

court is held" (quoting 12 Wright & Miller, *Federal Practice and Procedure* § 3013 (alteration in *NML*))).  More to the point, even the Fifth Circuit case Argentina cites made clear that the two general requirements—"used for a commercial activity" and present "in the United States," 28 U.S.C. § 1610(a)—are independent, with the "absence of either prong [being] fatal to the § 1610 executional immunity exception," *F.G. Hemisphere*, 455 F.3d at 591.  And, when describing the "used for a commercial activity" requirement at issue in this case, the Fifth Circuit reiterated, in line with circuit precedent, that the relevant question was whether the property "*has been used* for a commercial activity in the United States."  *Id*. (emphasis added).

Finally, Argentina worries that a totality-of-the-circumstances approach would "open the door to a commercial use *entirely in the past* (even pre-filing) abrogating the execution immunity of a foreign sovereign's property." Argentina Br. 40.  But, just as they need to steer clear of relying on the purely future commercial uses of concern to the Second Circuit, district courts examining the totality of the circumstances should avoid finding speculative or aberrational commercial uses, or uses in the distant past, sufficient to satisfy the "used for a commercial activity" requirement.  Both the Fifth and Ninth Circuit analyses described above are sensitive to this concern.  The fact remains that, in enacting the FSIA, Congress "shifted the responsibility for making determinations about foreign sovereign immunity from the Executive Branch to the Judiciary," *Grenada*, 768 F.3d at 84, with the House Report specifically explaining that courts were to "have a great deal of latitude in determining what is a 'commercial activity' for purposes of [the FSIA]," H.R. Rep. No. 94-1487, at 16.  In accordance with Congress' aims, we have confidence that district courts will carefully apply the totality-of-the-circumstances approach in each case to determine whether a

property may fairly be characterized as "commercial" for purposes of attachment.

## CONCLUSION

Because the district court applied the incorrect legal standard, we vacate and remand for the district court to determine whether, at the time of filing, the totality of the circumstances supported characterizing the R Street property as one "used for a commercial activity" and, if so, whether any of Argentina's other defenses bar attachment of its property.

*So ordered.*