# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 12, 2024          Decided May 24, 2024

No. 23-7112

BAINBRIDGE FUND LTD.,
APPELLANT

v.

REPUBLIC OF ARGENTINA,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-mc-00070)

*Anthony J. Costantini* argued the cause for appellant. With him on the briefs was *Drew T. Dorner*.

*Carmine D. Boccuzzi Jr.* argued the cause for appellee. With him on the brief was *Rathna J. Ramamurthi*.

Before: HENDERSON, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Bainbridge Fund Ltd. (Bainbridge) seeks to attach property owned by the

Republic of Argentina (Argentina) in partial satisfaction of a judgment entered against Argentina in 2020. Pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 *et seq.*, the property of a foreign sovereign cannot be attached unless the sovereign waives immunity and the property is used for commercial activity in the United States. The district court denied Bainbridge's application after evaluating Argentina's waiver of sovereign immunity in the bond giving rise to the judgment and finding that the property in question is not used for commercial activity.

Bainbridge appeals, arguing that the totality of the circumstances shows that the property is used for commercial activity and, alternatively, Argentina's waiver extended to an agreement not to invoke FSIA defenses, including the commercial activity requirement. But the facts show only aberrational commercial use over the last 25 years. In addition, Argentina's contractual waiver is subject to the FSIA's restrictions and does not amount to an explicit promise not to raise FSIA defenses. As detailed *infra*, we affirm the district court's denial of Bainbridge's application.

## I. BACKGROUND

On December 1, 2020, in the Southern District of New York, Bainbridge obtained a judgment against Argentina for $95,424,899.38. The judgment arose out of Argentina's default on a bond owned by Bainbridge and remains unpaid.

The bond giving rise to the judgment contained the following waiver of sovereign immunity by Argentina:

> To the extent that the Republic or any of its revenues, assets or properties shall be entitled . . . to any immunity from suit . . . from attachment in aid of execution of judgment,

from execution of a judgment or from any other legal or judicial process or remedy . . . the Republic has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction and consents generally for the purposes of the Foreign Sovereign Immunities Act to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment . . . .

J.A. 129.

Bainbridge now seeks to attach and execute upon the Chancery Annex, a building owned by Argentina and located at 2136 R Street NW, Washington, D.C. The property was used to "house both diplomats and commercial tenants" several decades ago but since 1997 has been "uninhabited and in a state of disrepair." *TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 780 (D.C. Cir. 2020) (discussing the Chancery Annex). The property is subject to residential property taxes. The Chancery Annex is used to store diplomatic files and access to the building is limited to members of Argentina's Ministries of Foreign Affairs and Defense. It is allocated to the Argentine Ministry of Foreign Affairs, International Trade & Worship and displays the Argentine flag and seal.

The Chancery Annex is not currently for sale but Argentina has listed the property twice. Both times Argentina attempted to sell the property, creditors unsuccessfully sought attachment. Argentina first listed the property in 2003 and removed the listing from the market in January 2004. *NML Cap., Ltd. v. Republic of Argentina*, 2005 WL 8161968, at *14 (D.D.C. Aug. 3, 2005). In August 2005, the district court reviewed the property's history and quashed the attempted

attachment because it was no longer on the market and "there [was] no evidence to support Argentina's present intent to sell." *Id.* Argentina relisted the property in 2018 and received multiple offers. *TIG Ins. Co.*, 967 F.3d at 780. A creditor filed a writ to attach the property and Argentina took the listing down three days later. *Id.* The *TIG Insurance* proceedings are ongoing. *See TIG Ins. Co. v. Republic of Argentina*, 2022 WL 3594601 (D.D.C. Aug. 23, 2022), *appeal filed*, No. 23-7064 (D.C. Cir.).

In July 2022, Bainbridge filed its application seeking both attachment of the Chancery Annex to satisfy the judgment in part and a writ of *fieri facias*. Pursuant to the FSIA, "property in the United States of a foreign state shall be immune from attachment" unless the property falls into one of the Act's enumerated exceptions. 28 U.S.C. § 1609. The exception at issue here provides that property "used for a commercial activity in the United States" is not immune from attachment if "the foreign state has waived its immunity from attachment in aid of execution." 28 U.S.C. § 1610(a)(1). We look to the totality of the circumstances at the time the application was filed to determine whether a property is "used for a commercial activity." *TIG Ins. Co.*, 967 F.3d at 782, 788.

The district court denied Bainbridge's application. It held that Section 1610(a)(1) contains two separate requirements for attachment: (1) the building must be "used for a commercial activity" and (2) the foreign state must waive immunity. The parties agreed that Argentina had waived immunity but disputed whether the Chancery Annex is used for a commercial activity. The district court found that the building's commercial uses were in the distant past and, at the time of filing, the building had some limited diplomatic uses and was otherwise in a state of disrepair. Considering the totality of the circumstances, the district court concluded that Bainbridge

failed to meet its burden to show that the property was used for commercial activity.

## II. ANALYSIS

The determination as to whether a property is used for commercial purposes "requires a court to both make factual findings concerning how the property was used and to reach legal conclusions concerning whether that particular use was 'for commercial purposes.'" *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 368 (5th Cir.), *decision clarified on reh'g*, 389 F.3d 503 (5th Cir. 2004). We review the district court's determination for clear error with respect to factual findings and *de novo* as to legal conclusions and the application of law to fact. *Id.*; *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004).

At this stage in the proceedings, Bainbridge bears the burden of persuasion to show that the FSIA authorizes attachment. Execution immunity is a "'default presumption' that the judgment creditor must defeat at the outset." *Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 482 (D.C. Cir. 2016) (quoting *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 800 (7th Cir. 2011)), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018); *accord TIG Ins. Co.*, 967 F.3d at 781. Only after Bainbridge defeats the presumption of execution immunity does the burden shift to the sovereign to show by a preponderance of the evidence that the claimed exception does not apply. *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).

### A.

Bainbridge argues that under the totality of the circumstances, the Chancery Annex satisfies the FSIA's

"commercial activity" requirement. Bainbridge points to two kinds of commercial use the property has been put to. First, in the 1980s and 1990s, Argentina leased the property to commercial tenants, an "unquestionably commercial activity." *NML Cap., Ltd.*, 2005 WL 8161968, at *14 (discussing the Chancery Annex). Second, Argentina contracted with a real estate agency and listed the property for sale in 2003–2004 and 2018. *See Friedman v. Gov't of Abu Dhabi*, 464 F. Supp. 3d 52, 70 (D.D.C. 2020) ("Contracts for services are generally considered commercial activities when entered into in the United States." (quotation omitted)). Bainbridge also claims that the district court ignored important facts in the record: the U.S. State Department has not considered the property diplomatic in nature for "many years," J.A. 184; the District of Columbia designates the property as "residential," J.A. 112; and Argentina has paid residential property taxes since at least 2005.

Reviewing these facts and considering the totality of the circumstances, we find no error in the district court's conclusion that the Chancery Annex was not "used for commercial activity" at the time of filing.

As used in the FSIA, "commercial activity" means "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Our precedent instructs that the phrase "used for a commercial activity" is "best interpreted as an adjectival phrase characterizing the kind of property that may be attached" rather than indicating any particular time frame for assessing the property's use. *TIG Ins. Co.*, 967 F.3d at 786. The property "retains its immunity protection where its commercial uses, considered holistically and in context, are bona fide exceptions to its otherwise noncommercial use." *Id.* at 786 (quoting *Af-Cap Inc.*, 383 F.3d at 370). We must avoid "an artificially

narrow lens" that would "allow[] one-time or aberrational uses to dictate the fate of the property." *Id.*; *see also id.* at 788 ("[J]ust as they need to steer clear of relying on the purely future commercial uses . . . , district courts examining the totality of the circumstances should avoid finding speculative or aberrational commercial uses, or uses in the distant past, sufficient to satisfy the 'used for a commercial activity' requirement.").

When Bainbridge filed its writ in July 2022, the Chancery Annex was allocated to an Argentine ministry, displayed the Argentine flag and seal, restricted access to certain Argentinian government officials, stored diplomatic files and was otherwise in a state of disrepair. It was listed for sale briefly four years earlier, as well as in 2003, and had not housed any tenants since 1997. The overall factual picture shows that, to the extent the Chancery Annex is being used for any purpose, it has some degree of diplomatic use and infrequent commercial use. There was plainly no regular course of commercial conduct in 2022 and the only particular commercial acts were either in the distant past (the commercial leases ending in 1997) or aberrational (the two sales listings). Commercial leases that ceased twenty-five years ago and two brief sale listings over a period of twenty years fall far short of demonstrating commercial use "considered holistically and in context." *See TIG Ins. Co.*, 967 F.3d at 786 (quoting *Af-Cap, Inc.*, 383 F.3d at 370).

Bainbridge places weight on the U.S. State Department no longer recognizing the Chancery Annex as diplomatic and Argentina's payment of residential property taxes, but those facts show at most that the property is not *diplomatic* and do nothing to show *commercial* use—the relevant inquiry here. The Chancery Annex may be used for nondiplomatic and noncommercial purposes and remain immune from attachment

under the plain text of the statute, as execution immunity remains intact so long as the property is not "used for a commercial activity." *See* 28 U.S.C. § 1610(a). The property would be immune from attachment if it were residential or unused by Argentina for any purpose. Bainbridge offers no support for its claim that Argentina must show some level of diplomatic use.[1]

Bainbridge also emphasizes Argentina's alleged gamesmanship in removing the sale listing in 2018 after a judgment creditor filed suit to attach it and keeping the property off the real estate market since then. But as the district court explained, Argentina's actions in 2018 are largely irrelevant to our analysis because the Chancery Annex was not on the market when Bainbridge filed suit. And Bainbridge provides no evidence for its suggestion that keeping the property off-market is a deliberate ploy to avoid attachment.

To the extent the Chancery Annex was being used at all before Bainbridge filed its suit, Argentina used it primarily to store diplomatic files. The handful of commercial acts took place long before filing and do not control the holistic character of the property. The totality of the circumstances thus shows that the Chancery Annex is not a property "used for commercial activity" under the FSIA.

---

[1] Bainbridge cites for the first time in its reply brief Section 1610(a)(4)(B), a provision exempting from immunity non-diplomatic property where the "execution relates to a judgment establishing rights in property." Any argument related to this subsection is forfeited, as it was not cited by the district court, Bainbridge's opening brief or Argentina's brief. *See, e.g.*, *Texas v. United States*, 798 F.3d 1108, 1115-16 (D.C. Cir. 2015). In any event, Section 1610(a)(4)(B) is subject to the same "commercial activity" limitation as (a)(1) so it would not change our analysis.

**B.**

In the alternative, Bainbridge argues that even if the Chancery Annex is not "used for commercial activity," Argentina has waived this requirement. Bainbridge reads the relevant language in the bond as containing two distinct clauses: (1) one clause in which Argentina "consent[ed] generally for the purposes of the [FSIA] to the giving of any relief . . . in connection with any . . . Related Judgment" (which Bainbridge terms the "Consent Clause"); and (2) one clause in which Argentina "irrevocably agreed not to claim and . . . irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction" (which Bainbridge terms the "Waiver Clause"). J.A. 129. Bainbridge contends that only the Waiver Clause is limited by the FSIA, while the Consent Clause makes no reference to the laws of the jurisdiction or other statutory restrictions and instead consents for the purposes of the FSIA, meaning it amounts to an agreement to forego invoking FSIA defenses.

The relevant contract language, however, shows that Argentina did not waive the "commercial activity" requirement under Section 1610(a). The so-called Consent Clause provides consent "*for the purposes of the Foreign Sovereign Immunities Act*." J.A. 129 (emphasis added). The explicit incorporation of the FSIA means that the most natural reading of the clause is that Argentina's consent is subject to the FSIA's restrictions, meaning all FSIA statutory defenses are available to Argentina in litigation. This reading is supported by the fact that the Consent Clause appears in the same sentence as the clause waiving immunity "to the fullest extent permitted by the laws of such jurisdiction," J.A. 129, which Bainbridge admits limits Argentina's waiver to FSIA provisions. The two clauses are linked by the conjunction "and" and there is no comma separating them, suggesting they are closely related.

Bainbridge's reading strains credulity by insisting that two clauses in the same sentence and in close proximity have vastly different meanings and legal effects, despite the fact that both clauses refer to laws limiting Argentina's agreement to subject itself to U.S. law.

This reading accords with how other courts have interpreted identical contractual language. The Second Circuit in *EM Ltd. v. Republic of Argentina* considered a bond in which Argentina similarly agreed to "consent[] generally for the purposes of the [FSIA]." 473 F.3d 463, 468 (2d Cir. 2007). In response to EM Ltd.'s argument that certain foreign assets should be immune because Argentina "affirmatively pledged *not to assert* such immunity in proceedings to enforce the judgment," the court found that "the scope of [Argentina's] agreement not to claim immunity is coextensive with its waiver of immunity; both reach only to the 'extent permitted under the laws of [the] jurisdiction.'" *Id.* at 481 n.19. And when Bainbridge raised its Consent Clause argument in separate proceedings against Argentina in the Southern District of New York, the district court had little trouble concluding that the language "clearly incorporat[es] the FSIA into the consent" and so the "best reading is that this provision too remains cabined by the statutory requirements of the FSIA." *Bainbridge Fund Ltd. v. Republic of Argentina*, 2023 WL 5747299, at *5 (S.D.N.Y. Sept. 6, 2023).

Even if Bainbridge's reading is a possible construction of the contractual language, any agreement not to raise FSIA defenses is not clear enough to amount to a waiver. Foreign states may waive immunity "either explicitly or by implication." 28 U.S.C. § 1605(a)(1). "[E]xplicit waivers of sovereign immunity are narrowly construed in favor of the sovereign and are not enlarged beyond what the language requires" so that a "foreign state will not be found to have

explicitly waived its immunity unless it has clearly and unambiguously done so." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022) (cleaned up).  Implied waiver under the FSIA is also construed narrowly and requires that the foreign state intended to waive its immunity. *Id.*  The Consent Clause is neither an explicit promise nor a clear indication of Argentina's intent to waive FSIA defenses. *See EM Ltd.*, 473 F.3d at 481 n.19 (Argentina did not make an "explicit promise not to assert any of the non-waivable protections of the FSIA in attachment proceedings"); *Bainbridge*, 2023 WL 5747299, at \*5 (same).  Because the bond does not evince an explicit promise or intent not to raise FSIA defenses, we do not address whether the "commercial activity" requirement of the FSIA is waivable, which is an issue of first impression in our circuit.

\* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*