# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 5, 2024                    Decided July 30, 2024

No. 23-7064

TIG INSURANCE COMPANY, AS SUCCESSOR BY MERGER TO
INTERNATIONAL INSURANCE COMPANY AND INTERNATIONAL
SURPLUS LINE INSURANCE COMPANY,
APPELLANT

v.

REPUBLIC OF ARGENTINA, AS SUCCESSOR TO CAJA NACIONAL
DE AHORRO Y SEGURO AND CAJA NACIONAL DE AHORRO Y
SEGURO,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-mc-00129)

———

*Mark N. Bravin* argued the cause for appellant. With him on the briefs was *Theresa B. Bowman*.

*Rathna J. Ramamurthi* argued the cause for appellee Republic of Argentina. With her on the brief were *Carmine D. Boccuzzi Jr.* and *Charles M. Asmar*. *Thomas R. Lynch* entered an appearance.

2

Before: RAO, WALKER, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

GARCIA, *Circuit Judge*: This appeal involves an insurance company's efforts to enforce two judgments against the Republic of Argentina. It implicates several questions concerning the scope of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*, which grants foreign states immunity from the jurisdiction of federal and state courts in the United States, subject to certain express exceptions. We conclude that two of those exceptions—the arbitration and waiver exceptions—may apply in this case, and remand to the district court for further analysis and factfinding.

**I**

The following facts and procedural history are drawn from undisputed facts and prior decisions involving the parties. *See TIG Ins. v. Republic of Argentina* ("*TIG I*"), 2019 WL 3017618 (D.D.C. July 10, 2019), *vacated and remanded*, *TIG Ins. v. Republic of Argentina* ("*TIG II*"), 967 F.3d 778 (D.C. Cir. 2020); *Int'l Ins. v. Caja Nacional de Ahorro y Seguro*, 293 F.3d 392 (7th Cir. 2002).

**A**

TIG Insurance Company ("TIG") is a private insurance company resulting from a series of mergers of other insurance companies. For simplicity, we refer to TIG and its predecessors as "TIG." In 1979, TIG entered into two reinsurance contracts with Caja Nacional de Ahorro y Seguros ("Caja"), a state-owned Argentine company. Reinsurance, put simply, is insurance for insurers. TIG agreed to pay Caja a share of the premiums TIG received on underlying insurance policies in exchange for Caja's payment of a share of certain

losses TIG became obligated to pay under those policies. TIG alleges that Caja repeatedly failed to pay TIG as promised.

Beginning in the 1990s, the Republic of Argentina ("Argentina") issued a series of resolutions addressing Caja's corporate status and operations. In 1994, Argentina declared Caja dissolved and placed it in the process of liquidation. In 1998, Argentina declared "transferred to the National Treasury the liquidated liabilities and the contingent liabilities and assets" of Caja "derived from the reinsurance businesses active in the international private market." J.A. 237.

In 2000, TIG initiated arbitral proceedings against Caja for failing to pay under the reinsurance contracts. TIG won by default. In 2001, TIG confirmed that arbitral award against Caja in the Northern District of Illinois (the "2001 judgment") in default proceedings. The Seventh Circuit upheld the judgment. *See Int'l Ins.*, 293 F.3d at 401.

After the 2001 judgment, Argentina issued additional resolutions about Caja's status. In 2003, Argentina transferred to its Legal Undersecretary responsibility for handling Caja's international docket of foreign court litigation and international arbitrations "through . . . final conclusion" of each matter. J.A. 887. In 2005, Argentina transferred to itself Caja's "liquidated" and "contingent assets and liabilities." J.A. 252.

In 2016, TIG initiated a second arbitral proceeding, again alleging breach of the reinsurance contracts, but this time against Argentina. TIG won by default, with the arbitral panel accepting TIG's position that Argentina was Caja's successor-in-interest and therefore subject to the arbitration provision in the contracts. In 2018, TIG confirmed the second arbitral award against Argentina, again in the Northern District of Illinois, and again by default (the "2018 judgment").

4

Later in 2018, TIG learned that Argentina had listed real estate for sale in the District of Columbia. Prompted by this discovery, TIG registered the 2001 and 2018 judgments in the District of Columbia under 28 U.S.C. § 1963. TIG simultaneously filed an omnibus motion for emergency relief, attachment-related relief, and a writ of execution on the property. Soon after, Argentina pulled the real estate listing from the market, despite pending offers to buy the property. In the district court, Argentina opposed TIG's omnibus motion, relying on the Foreign Sovereign Immunities Act of 1976 ("FSIA").

**B**

The FSIA "confers on foreign states two kinds of immunity." *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 142 (2014). The first is jurisdictional immunity, pursuant to which "a foreign state shall be immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604, subject to several enumerated exceptions, *see id.* §§ 1605–1607. The second is execution immunity, which further protects foreign sovereigns by ensuring that in the event of an adverse judgment, the sovereign's property in the United States "shall be immune from attachment[,] arrest[,] and execution," *id.* § 1609, again subject to several enumerated exceptions, *see id.* §§ 1610–1611.

Because of the FSIA's dual immunities, parties seeking judicial enforcement of an award against a foreign state face two hurdles: They must "establish both that the foreign state is not immune from suit and that the property to be attached or executed against is not immune" from execution. *TIG II*, 967 F.3d at 781.

In 2018, facing TIG's omnibus motion, Argentina raised execution immunity and prevailed. According to the district court, Argentina's property was immune from execution

because Argentina had taken the property off the market. This meant that the property was not "used for a commercial activity"—a prerequisite for certain of the FSIA's execution immunity exceptions—at the time the court's writ would issue. *TIG I*, 2019 WL 3017618, at *3–4; *see* 28 U.S.C. § 1610(a).

TIG appealed, and we vacated and remanded. We held that whether a property is "used for a commercial activity" depends on the "totality of the circumstances" at the time when the motion for a writ of attachment is filed, not when the writ would issue. *TIG II*, 967 F.3d at 785; *see also Bainbridge Fund Ltd. v. Republic of Argentina*, 102 F.4th 464, 468–70 (D.C. Cir. 2024) (applying the "totality of circumstances" test to the same Argentina-owned property in a suit involving a different judgment creditor).

On remand, Argentina again moved to dismiss. It continued to argue that the property was not used for "commercial activity" and therefore immune from execution. But Argentina also raised jurisdictional immunity under the FSIA. In response, as relevant to this appeal, TIG argued that two of the FSIA's exceptions to jurisdictional immunity applied: the arbitration exception, 28 U.S.C. § 1605(a)(6), and the waiver exception, *id.* § 1605(a)(1).

TIG argued that two provisions in Caja's reinsurance contracts triggered those exceptions, and that Argentina now stood in Caja's shoes. First, Caja had agreed to submit disputes under the contracts to arbitration in Chicago, Illinois (the "arbitration provision"). J.A. 305, 325. Second, Caja had agreed that "all matters arising hereunder shall be determined in accordance with the law and practice" "of any court of competent jurisdiction within the United States" (the "choice-of-law provision"). J.A. 304, 324.

TIG argued that Argentina was bound by these contract provisions just like Caja because of Argentina's relationship to

Caja. Relevant to this appeal, TIG offered two theories. The first was that Argentina became Caja's "successor-in-interest" by issuing the official resolutions, under which Argentina "expressly assumed all of Caja's legal obligations, assets, and liabilities" under the reinsurance contracts. Appellant's Brief 50. TIG's second theory was that Argentina used Caja as an "alter ego." Under the alter ego principle, a court can find that an entity like Caja lacks a separate identity from another controlling entity. *See, e.g.*, *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 623–30 (1983).

The district court construed Argentina's motion to dismiss as a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(4) and issued two decisions, requesting supplemental briefing in between. The court sided with Argentina on all issues. For the 2018 judgment, the district court held that the Illinois district court lacked jurisdiction over Argentina because none of TIG's asserted exceptions applied. The district court also rejected TIG's request for jurisdictional discovery. For the 2001 judgment, the court held that TIG needed to amend the judgment back in Illinois to name Argentina before seeking enforcement in federal court here. Based on these rulings, the district court concluded that it need not revisit the execution immunity dispute.

TIG sought reconsideration on several issues, which the district court denied. TIG then appealed.

## II

We review a dismissal for lack of jurisdiction *de novo* with respect to legal conclusions. *Simon v. Republic of Hungary*, 77 F.4th 1077, 1094 (D.C. Cir. 2023). We review a denial of jurisdictional discovery for abuse of discretion. *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 43 (D.C. Cir. 2020). We

likewise review a denial of a motion for reconsideration for abuse of discretion. *Cobell v. Jewell*, 802 F.3d 12, 23 (D.C. Cir. 2015).

### III

TIG argues that two FSIA exceptions independently provided the Illinois district court jurisdiction over Argentina to enter the 2018 judgment. We start with the arbitration exception. Contrary to the district court, we conclude that the exception may apply subject to further analysis and factfinding on remand.

### A

The arbitration exception provides, in relevant part, that a foreign state shall not be immune from the jurisdiction of a United States court for an action

> brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship . . . or to confirm an award made pursuant to such an agreement to arbitrate.

28 U.S.C. § 1605(a)(6).

As the district court recognized, the parties' dispute is limited. *See TIG Ins. v. Republic of Argentina* ("*TIG III, Part One*"), 2022 WL 1154749, at *6 (D.D.C. Apr. 18, 2022). The parties agree that the reinsurance contracts are agreements that call for the arbitration of "any differences." And they agree that the arbitral award confirmed in the 2018 judgment arises from the reinsurance contracts. Their only disagreement is whether the reinsurance contracts' arbitration provision was

"made by" Argentina because Caja, not Argentina, signed the contracts with TIG. *See* Appellant's Brief 42–50; Appellee's Brief 21–27.

In TIG's view, a court should determine whether the arbitration agreements were "made by" Argentina by deciding whether Argentina, as a nonsignatory to the contract, is nonetheless bound by the agreement under ordinary contract law principles. *See* Appellant's Brief 42–48. And here, TIG says, Argentina is so bound. *Id.* at 48–50.

According to TIG, Argentina is Caja's successor-in-interest. Under successorship principles, when a nonsignatory takes certain steps in relation to a contract (such as, in many jurisdictions, assuming another entity's liabilities under that contract), the nonsignatory can be treated as bound to the contract's obligations, no different than the original party. *See BMG Monroe I, LLC v. Village of Monroe*, 93 F.4th 595, 598 n.1 (2d Cir. 2024) ("Successors in interest stand in the shoes of their predecessors . . . as if they were parties to the original agreements and actions of their predecessors." (cleaned up)); *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 700–01 (2d Cir. 2009). TIG submits that Argentina's official resolutions expressly "assumed" Caja's assets and liabilities flowing from the reinsurance contracts, as well as future legal obligations related to those contracts. After those resolutions, in TIG's view, Argentina cannot pick and choose which provisions of the contracts it wishes to be bound by; it is bound by *all*, including the arbitration provision. TIG points to cases where courts have held that arbitration provisions specifically may be enforced against the successors-in-interest of the original signatories. *See, e.g.*, Appellant's Brief 26–27 (collecting cases); *see also* 21 R. Lord, Williston on Contracts § 57:19, p. 183 (4th ed. 2017) ("Under an assumption theory, a party may be bound by an arbitration clause if its subsequent conduct indicates that [it] is assuming the obligation to

arbitrate, despite being a nonsignatory."). According to TIG, because Argentina is Caja's successor-in-interest to the reinsurance contracts, it is bound by the arbitration provision, and the reinsurance contracts are "made by" Argentina for the purposes of the arbitration exception.

Argentina offers a different approach. Rather than assessing whether the sovereign is bound by the arbitration provision, Argentina argues that a court should simply ask whether the sovereign (or its alter ego) originally signed the contract containing the provision. Under Argentina's proposed inquiry, it is irrelevant whether Argentina assumed Caja's assets and liabilities under the reinsurance contracts (which Argentina disputes). Because only Caja signed the reinsurance contracts, Argentina says, the reinsurance contracts were not "made by" Argentina. *See* Appellee's Brief 42–49.

The district court agreed with Argentina. It held that an arbitration agreement is only "made by" the parties who signed the contract "at the time of formation." *TIG III, Part One*, 2022 WL 1154749, at *7. So "even if Argentina is Caja's successor-in-interest" and "assumed Caja's contractual liabilities," "the arbitration agreements were nonetheless not 'made by' Argentina so as to waive sovereign immunity." *Id.* at *8. The district court therefore did not analyze whether Argentina is successor-in-interest to Caja under the reinsurance contracts. *See id.*

**B**

On appeal, TIG again urges that if Argentina adopted the arbitration agreement under successorship principles, then the agreement qualifies as one "made by the foreign state . . . to submit to arbitration" under the FSIA's arbitration exception. 28 U.S.C. § 1605(a)(6). We agree with TIG and conclude that an agreement is "made by" a sovereign if it legally binds that sovereign to arbitrate with the party opposing the sovereign's

sovereign immunity. That question is answered by resort to ordinary principles of contract law, which may include successorship and assumption if the governing law recognizes them. We reject the contrary view, under which an arbitration agreement can only be "made by" a sovereign that was an original party to it.

Our analysis begins with the statute's text. We must read the statutory text as a whole and assess the words in the context in which they are used. *See, e.g.*, *Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. UAW*, 523 U.S. 653, 657 (1998) ("It is not the meaning of 'for' we are seeking here, but the meaning of 'suits for violation of contracts.'" (alteration omitted)); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The key phrase here is "an agreement made by the foreign state . . . to submit to arbitration." 28 U.S.C. § 1605(a)(6). That phrase supports TIG's position that an arbitration agreement is "made by" a sovereign that later adopts the agreement just as much as a sovereign who was a party to the agreement when it was initially made.

To "make" in the context of making a contract or agreement is commonly understood to include later adoption of that agreement. For example, both TIG and the district court cite the then-current version of Black's Law Dictionary, which defined to "make a contract" as "[t]o agree upon, and conclude *or adopt*, a contract." *Make a Contract*, Black's Law Dictionary (5th ed. 1979) (emphasis added). This understanding of to "make"—as TIG urges—encompasses a nonoriginal signatory who later adopts an agreement to arbitrate.

Moreover, the word "agreement" as it appears in the statutory phrase is best understood as an act that has the legal consequence of requiring the sovereign to arbitrate. *See Agreement*, Black's Law Dictionary (5th ed. 1979) ("In law, a

concord of understanding and intention between two or more parties with respect to the effect upon their relative rights and duties, of certain past or future facts or performances."); *see also Contract*, Black's Law Dictionary (5th ed. 1979) ("An agreement between two or more persons which creates an obligation to do or not to do a particular thing."). If the sovereign is not an original signatory but takes actions that cause it to adopt and become subject to the agreement, nothing in the ordinary meaning of the statutory text suggests the sovereign does not qualify as having "made" the "agreement."

Argentina's original-parties-only argument would perhaps gain some force if we instead looked at the words "made by" in isolation. After all, "make"—the word stem of "made"—can mean "[t]o cause to exist"; "[t]o form, fashion or produce"; or "[t]o do, perform, or execute." *Make*, Black's Law Dictionary (5th ed. 1979). Zooming in on just those words, as Argentina would have us do, one could conclude that Argentina could only "make" an agreement that it participated in drafting. But, as already explained, that is not how we interpret statutes. We must read the statutory text as a whole and in context; doing so here supports TIG's view, not Argentina's.

In adopting Argentina's reading, the district court found it important that "made by" is a "past participial phrase." *TIG III, Part One*, 2022 WL 1154749, at *7. The court then concluded that "made by" refers only to the parties present at "the time of formation." *Id.* The use of a verb tense can be significant in construing statutes. *See, e.g.*, *United States v. Wilson*, 503 U.S. 329, 333 (1992); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 63 n.4 (1987). But here it is not obvious that *any* tense applies to the phrase "made by." *Cf. TIG II*, 967 F.3d at 782–83 (declining to associate any tense with "used" in the phrase "used for a commercial activity"). Moreover, even accepting the view that the phrase is past tense would do nothing to support

Argentina's position. Relative to the time when an "action is brought" to "enforce" an arbitration agreement, 28 U.S.C. § 1605(a)(6), both the moment an agreement is first created and the moment a nonsignatory adopts the agreement would be in the past. The facts of this case illustrate the point: If Argentina's actions in the 1990s and 2000s caused it to adopt the arbitration agreement, then it can be said to have "made" the agreement at that past time.

The district court also stated—and Argentina repeats on appeal—that "if Congress had intended the arbitration exception to" apply here, it could have said the exception applies to "agreements that 'bound' or 'governed' foreign states, as opposed to agreements that those states 'made.'" *TIG III, Part One*, 2022 WL 1154749, at *7; *see* Appellee's Brief 41. True enough. But Congress also could have specified that an agreement be "signed by" or "originated by" the foreign state if it intended the contrary reading. That the statute could have been more specific in either direction "does not aid our inquiry." *Robinson*, 519 U.S. at 341.

The district court also found its original-signatories-only reading supported by the fact that the arbitration exception exists at least in part to implement the Inter-American Convention on International Commercial Arbitration, a multilateral treaty commonly known as the Panama Convention. *TIG III, Part One*, 2022 WL 1154749, at *7 (citing An Act to Implement the Inter–American Convention on International Commercial Arbitration, Pub. L. No. 100-669, 102 Stat. 3969 (1988)). That convention applies to "parties" who have "undertake[n] to submit to arbitral decision any differences that may arise or have arisen between them" in an "agreement." Inter-American Convention on International Commercial Arbitration art. 1, Jan. 30, 1975, T.I.A.S. 90-1027, 1438 U.N.T.S. 245. Neither that language nor any other aspect of the convention that we can identify, however, speaks to

whether a sovereign that takes steps to assume or adopt a contract is covered. The convention therefore does not assist our analysis.[1]

Our understanding of the exception is reinforced by the FSIA's broader context. Congress enacted the FSIA with the "express goal of codifying the restrictive theory of sovereign immunity." *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 182 (2021). Under the restrictive theory, in contrast to "the absolute or classical theory of sovereign immunity," "immunity extends to a sovereign's public but not its private acts." *Id.* "Most of the FSIA's exceptions" give effect to "the overarching framework of the restrictive theory" by targeting situations where a sovereign has engaged in private acts. *Id.* at 182–83. And here, Argentina is alleged to have entered the private insurance industry through its assumption of Caja's business, including its assets and liabilities. A rule under which a sovereign is free to take over another entity's obligations under a contract with an arbitration provision yet escape the immunity-waiving effect of the arbitration agreement would seem to frustrate the FSIA's basic aim. *Cf. Aguas Lenders*, 585 F.3d at 701 ("Successorship doctrine prevents parties to contracts from using evasive, formalistic means lacking economic substance to escape contractual obligations.").

---

[1] The district court's brief discussion of the exception's purpose cited a Second Circuit decision that expressed skepticism in dicta towards the "applicability" of an "equitable doctrine" like "benefits estoppel" as a basis to "abrogate a state's immunity under" the arbitration exception. *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 67 (2d Cir. 2021). In support, the Second Circuit noted that the exception's purpose was to "implement" the Panama Convention. *Id.* at 68 n.28 (quotation omitted). *Gater Assets* does not explain how the Panama Convention supports an original-signatories-only reading of the exception, nor does the decision engage in the broader statutory interpretation we must here.

14

Finally, Argentina contends that an interpretation focusing on whether the agreement binds the sovereign is improper because the FSIA "replac[ed] the old executive-driven, factor-intensive, loosely common-law-based immunity regime." *NML Cap., Ltd.*, 573 U.S. at 141. It is true that the FSIA embodies Congress's effort to replace a body of common law addressing sovereign immunity that lent itself to "inconsistent application" by the Department of State, which then enjoyed "primary responsibility" for deciding immunity claims. *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010). The question posed here, though, is not whether the FSIA displaced the common law of sovereign immunity—which it surely does—but rather whether Congress intended the FSIA to displace the substance of common law on *other* subjects, such as contract law, that would inform the meaning of the FSIA's immunity exceptions. *Cf. id.* at 320 (asking "whether Congress intended the FSIA to supersede the common law" on the specific subject at issue).

There is no indication that Congress intended the FSIA to displace common-law contract principles that inform our understanding of what constitutes the "making" of an "agreement." As we have noted, many sources of law "allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver[,] and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (cleaned up). For example, when Congress added the FSIA arbitration exception in 1988, the common law in at least some jurisdictions had already developed to recognize that "[o]rdinary contract principles determine who is bound" to an agreement, and "the mere fact that a party did not sign an arbitration agreement does not mean that it cannot be held bound by it." *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 523 F.2d 527, 539 (2d Cir. 1975); *see Kamakazi Music Corp. v. Robbins Music Corp.*, 684

F.2d 228, 231 (2d Cir. 1982); *Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529, 1534–35 (S.D.N.Y. 1985).

We see nothing in the FSIA's arbitration exception that "purports to alter" otherwise applicable "background principles" concerning who is bound by arbitration agreements. *Arthur Andersen LLP*, 556 U.S. at 630. Instead, the FSIA provides no guidance on how covered agreements can be made, and thus necessarily requires courts to look to other sources of law to make those determinations. The Supreme Court reached a similar conclusion in construing the Federal Arbitration Act, explaining that the Act does not "alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." *Id.* Instead, that Act requires looking to an "external body of law" to resolve those questions. *Id.* So too here.

Indeed, both the district court and Argentina accept that at least one external, common-law principle already bears on what qualifies as an arbitration "agreement made by a foreign state." *See TIG III, Part One*, 2022 WL 1154749, at *8–10; Appellee's Brief 15. This is the "alter ego" principle. Under that principle, a court can find that one entity lacks a separate identity from another controlling entity. The actions of the first entity can then be imputed to the sovereign for the purposes of waiving sovereign immunity. *See Bancec*, 462 U.S. at 629–30. And specific to the arbitration exception, in line with Argentina's and the district court's view, we have assumed that when a sovereign's "alter ego" enters into an agreement, that agreement is "made by" the sovereign. *See GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598, 605 (D.C. Cir. 2016). In this case, TIG argues that Caja was Argentina's alter ego, which we address in Section V. But the key point for present purposes is that Argentina does not dispute that if Caja were Argentina's "alter ego," then the reinsurance contracts'

arbitration agreements are properly said to be "made by" Argentina.

Reconciling Argentina's position with our precedent would therefore require us to declare that the FSIA recognizes the alter ego principle as the one and only external, common-law method of binding a nonparty to an arbitration agreement. We can identify no basis in the FSIA or logic for that conclusion. *See* 21 Williston § 57:19, p. 183 (listing both "alter ego" and "assumption" as examples of several grounds on which "a party, despite being a nonsignatory to an arbitration agreement, may be equitably bound to arbitrate under traditional principles of contract and agency law").

## C

In sum, we hold that under the FSIA's arbitration exception, an agreement can be "made by" sovereigns other than original signatories. We further hold that because the FSIA provides no law to guide the determination whether an enforceable arbitration agreement exists, that question must be answered based on external sources of law.

On remand, the district court must first consider what source of law governs the question of enforcement of the arbitration provision. That is because the precise legal test for whether (and how) a successorship theory can compel arbitration against a nonsignatory can be different from one jurisdiction to another. This is generally a question of state law. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."). But there may be arguments that federal common law or another source of law governs. *Cf. Bancec*, 462 U.S. at 623 (declining to decide whether international law or federal common law governs the question of a state instrumentality's

separate juridical status). The parties have not briefed this choice-of-law issue; the district court must consider it on remand.

The district court must then determine whether, under that law, Argentina is subject to the arbitration provision. This will likely involve factfinding on the existence of a successorship relationship, if any, between Argentina and Caja. Indeed, there appears to be at minimum a dispute of fact over whether Argentina assumed liabilities under the reinsurance contracts. *Compare* J.A. 220 (TIG affidavit stating that annex to one Argentine resolution specifies liabilities to TIG), *with* Appellee's Brief 6 (citing declarations and claiming that the liabilities were not active when Argentina began issuing its resolutions). The district court must resolve this dispute and any others that may bear on the analysis required by the source of law governing the question of enforcement of the arbitration provision against Argentina.

**IV**

We turn now to the second exception TIG contends provided the Illinois district court jurisdiction over Argentina to enter the 2018 judgment: the waiver exception. Again, contrary to the district court here, we conclude that the exception may apply subject to further analysis and factfinding on remand.

**A**

The FSIA's waiver exception "recognizes two species of waiver": explicit and implicit. *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022). This case concerns the latter, which provides that a United States court has jurisdiction for an action "in which the foreign state has waived its immunity . . . by implication." 28 U.S.C. § 1605(a)(1). We "constru[e] the implied waiver provision narrowly." *Creighton*

*Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999).

The FSIA does not define what constitutes waiver by implication. Our court has identified "only three circumstances" in which a sovereign will be treated as having impliedly waived its immunity. *Khochinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021) (quotation omitted). They are the sovereign's: (1) "executing a contract containing a choice-of-law clause designating the laws of the United States as applicable"; (2) "filing a responsive pleading without asserting sovereign immunity"; or (3) "agreeing to submit a dispute to arbitration in the United States." *Id.* at 8–9 (internal quotation marks omitted). "The legislative history of the FSIA provides only" these "three examples of implicit waivers by a foreign state, and courts" including ours "have been reluctant to recognize an implicit waiver of sovereign immunity in other circumstances." *Wye Oak Tech., Inc.*, 24 F.4th at 691 (citation omitted); *see* H.R. Rep. No. 94-1487, at 18 (1976); S. Rep. No. 94-1310, at 17–18 (1976).

TIG argues all three scenarios here. The district court found none of them applicable. *TIG III, Part One*, 2022 WL 1154749, at *10–11; *TIG Ins. v. Republic of Argentina* ("*TIG III, Part Two*"), 2022 WL 3594601, at *5–7 (D.D.C. Aug. 23, 2022). We address the arbitration and choice-of-law scenarios together before addressing the responsive-pleading scenario.

**B**

For the arbitration and choice-of-law scenarios, TIG relies on the same basic theory it raised for the arbitration exception: Because Argentina took affirmative steps that render it Caja's successor-in-interest, Argentina has agreed to the contracts' arbitration and choice-of-law provisions, and it has therefore impliedly waived immunity. Appellant's Brief 23–41. Argentina responds that what matters for implied waiver is not

whether Argentina is bound by the provisions, but rather whether there is evidence that it subjectively intended to withdraw its sovereign immunity. Appellee's Brief 27–38. Here, it says, TIG points to none. *Id.*

We do not read the implied waiver provision to require evidence of subjective intent to waive sovereign immunity. As explained, this court has already endorsed three scenarios, drawn from the statute's legislative history, in which an implied waiver will be found. *See supra* pp. 18 (collecting cases). Those examples depend on the sovereign taking specific steps which "the courts" have held indicate a willingness to submit to litigation in this country. H.R. Rep. No. 94-1487, at 18 (1976); S. Rep. No. 94-1310, at 17–18 (1976). The nature of the examples necessarily entails an objective, rather than subjective, assessment of intent. As the Second Circuit has put it, these "three examples are persuasive evidence that Congress primarily expected courts to hold a foreign state to an implied waiver of sovereign immunity by the state's actions in relation to the conduct of litigation." *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 243–44 (2d Cir. 1996).

When a sovereign takes the specified acts, nothing in our cases nor the FSIA's legislative history they draw on indicates that there must be a further inquiry into whether the sovereign affirmatively believed it was waiving immunity. There is, for example, no suggestion in the statute or our precedent that if a sovereign "fil[ed] a responsive pleading without asserting sovereign immunity" or "agree[d] to submit a dispute to arbitration in the United States," *Khochinsky*, 1 F.4th at 9 (quotation omitted), there would nevertheless be a further inquiry into whether the sovereign subjectively intended to waive its sovereign immunity by doing so. The FSIA instead deems the sovereign to have the requisite intent when it takes the specified steps because they "indicate[] its amenability to

suit" in this country. *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994). The Sixth Circuit has similarly concluded that if a sovereign is the successor-in-interest to a contract containing an agreement to arbitrate in the United States, it may be found to have impliedly waived its sovereign immunity under Section 1605(a)(1). *Gen. Star Nat'l Ins. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 440 (6th Cir. 2002).

We emphasize again, however, that beyond the three examples we have endorsed where it is appropriate to find implied waiver, the provision must be applied "narrowly." *Creighton Ltd.*, 181 F.3d at 122.

The district court correctly framed the analysis at the outset as whether Argentina "agreed to" the provisions at issue. *TIG III, Part Two*, 2022 WL 3594601, at *5–6. It then embarked on a different inquiry into Argentina's subjective intent, rather than analyzing whether Argentina is properly treated as agreeing to the provisions and therefore as having implicitly waived its sovereign immunity. *Id.* at *7. Implied waiver thus requires the same conceptual inquiry described above for the arbitration exception: If Argentina's conduct renders it subject to those provisions as a matter of law, it has impliedly waived its sovereign immunity.

On remand, because TIG contends here that Argentina's succession to both the choice-of-law and arbitration provisions are bases for implied waiver, the district court must analyze enforcement of the arbitration provision, per the inquiry we set out for the arbitration exception, but it must also analyze whether, under the applicable source of law, TIG can enforce the choice-of-law provision against Argentina on a successorship theory.

## C

As mentioned, the other scenario for implied waiver is when a sovereign files "a responsive pleading without asserting sovereign immunity." *Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021). We will not find a waiver on this ground "absent a conscious decision to take part in the litigation and a failure to raise sovereign immunity despite the opportunity to do so." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990) (quotation omitted).

Here, TIG emphasizes that when Argentina opposed TIG's motion for emergency relief in 2018 and 2019, it argued only execution immunity defenses, not jurisdictional immunity defenses. Argentina's decision to wait, TIG says, is akin to filing a responsive motion without asserting sovereign immunity.

As the district court explained, TIG's argument fails for the simple reason that Argentina has not filed a responsive pleading in this case. Argentina entered a special appearance in the case to contest jurisdiction and subsequently filed motions seeking dismissal by asserting the court's lack of jurisdiction on various grounds. *See TIG III, Part One*, 2022 WL 1154749 at *3–4, *10. "[A] motion to dismiss . . . is not considered a responsive pleading." *Bowden v. United States*, 176 F.3d 552, 555 (D.C. Cir. 1999); *see also Adkins v. Safeway, Inc.*, 985 F.2d 1101, 1102 (D.C. Cir. 1993) ("Only complaints, answers, replies to counterclaims, and third-party complaints and third-party answers are 'pleadings.'" (quoting Fed. R. Civ. P. 7(a))). Because Argentina has not filed a responsive pleading, the third scenario of implied waiver is not present here.

**V**

TIG also argues, as a separate theory relevant to multiple FSIA exceptions, that Argentina used Caja as its alter ego. The district court rejected TIG's argument, and we agree.

**A**

Under the FSIA, the "instrumentality" of a sovereign is afforded both sovereign immunity and a presumption of separateness from the sovereign. *Bancec*, 462 U.S. at 627. That presumption "applies to jurisdictional issues." *Foremost-McKesson, Inc.*, 905 F.2d at 446. This means that actions taken by the instrumentality that waive its own immunity will not necessarily be imputed to the sovereign to waive its immunity. *See Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 847 (D.C. Cir. 2000). TIG has not disputed, either in the district court or on appeal, that Caja is an instrumentality of Argentina for the purposes of alter ego analysis, and therefore that a presumption of separateness applies for purposes of that analysis. *See TIG III, Part One*, 2022 WL 1154749, at *9.

"That presumption can be overcome," however, if the instrumentality is the sovereign's alter ego. *Transamerica Leasing, Inc.*, 200 F.3d at 847. An alter ego relationship exists in either of two situations: (1) the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) "recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'" *Id.* at 848 (quoting *Bancec*, 462 U.S. at 629). Under either scenario, the actions of the alter ego corporation can be imputed to a sovereign to work a waiver of sovereign immunity. *See, e.g.*, *Foremost-McKesson, Inc.*, 905 F.2d at 446.

As the parties agree, *see* Appellant's Brief 54; Appellee's Brief 47, TIG bore "the burden of asserting facts sufficient to withstand a motion to dismiss regarding the . . . relationship," *Foremost-McKesson, Inc.*, 905 F.2d at 447; *see GSS Grp. Ltd.*, 822 F.3d at 605 n.9.[2] TIG's lackluster effort to present its alter ego theory below fails under that standard.

TIG's procedural opportunity to assert facts supporting its alter ego theory came in its opposition to Argentina's motion to dismiss after our remand. Yet in that submission TIG sketched its alter ego theory in only the most skeletal way and failed to allege any relevant facts or put forward any relevant evidence. *See* J.A. 634–35. TIG does not dispute that Caja was initially established in 1915 as an independent entity. *See* Appellant's Brief 59. The only facts TIG identified as showing that Caja was Argentina's alter ego at the time Caja entered the reinsurance contracts in 1979 were Argentina's liquidation resolutions in the 1990s and 2000s. *See* J.A. 634–35. TIG claimed without elaboration that the resolutions "confirm that Caja existed under Argentina's complete control" and "was in some stage of significant undercapitalization," which are

---

[2] The district court stated that TIG bore the burden of proof on this issue. *TIG III, Part One*, 2022 WL 1154749, at *8. TIG challenges that conclusion, pointing to our cases applying the FSIA exceptions generally, which instead set out a burden-shifting approach under which the plaintiff bears a burden of production, but then the sovereign must prove that the immunity exception at issue does not apply. Appellant's Brief 54–58. At the same time, we have suggested that a plaintiff does in fact bear the burden of proof on the specific question of whether a nominally independent entity was a sovereign's alter ego. *See Foremost-McKesson, Inc.*, 905 F.2d at 447. As explained, however, the parties in this case agree that at the motion-to-dismiss stage a plaintiff bears the burden of asserting plausible facts sufficient to withstand a motion to dismiss. We therefore need not resolve the parties' dispute over who bears the burden of proof later in the suit.

"'critical' factors in determining whether an entity is an 'alter ego' of the sovereign." J.A. 634 (quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 420 (5th Cir. 2006)).

The key questions, however, are whether Argentina exerted "complete domination" over Caja, *Transamerica Leasing, Inc.*, 200 F.3d at 848, or whether Caja was effectively Argentina's "agent," *id.* at 849, when Caja entered the reinsurance contracts with TIG in 1979. On their face, the far-later-in-time resolutions do not speak to those questions at all. And aside from citing the resolutions, TIG made no argument about why the resolutions supported its alter ego claim. Again, TIG stated only that the resolutions "confirm" a controlling relationship and vaguely asserted—without specific connection even to the resolutions—that Caja was undercapitalized. J.A. 634–35. This is plainly insufficient to survive Argentina's motion to dismiss.

For similar reasons, TIG also failed to meet its burden on the alternative alter ego theory that treating Argentina and Caja as separate would work "fraud or injustice." *Bancec*, 462 U.S. at 629 (quoting *Taylor v. Standard Gas & Elec. Co.*, 306 U.S. 307, 322 (1939)). TIG's opposition memorandum was devoid of any argument directed to this theory. The district court thus correctly concluded, on the record before it, that TIG had "proffered no evidence that Argentina manipulated Caja when the insurance contracts were signed so that Argentina could benefit from them without risk." *TIG III, Part One*, 2022 WL 1154749, at *10. Nor had it put forth "evidence that Argentina used Caja 'to defeat any statutory policy of either [Argentina] or the United States.'" *Id.* (quoting *Transamerica Leasing Inc.*, 200 F.3d at 854) (alteration in original). Nor did it offer "evidence that Argentina is trying to reap the benefits of American courts while avoiding potential downside." *Id.* TIG's evidence suggested "simply a run of the mill alleged

contractual breach," not fraud or injustice. *Id.* (quoting *GSS Grp. Ltd.*, 822 F.3d at 608).

Finally, TIG argues in its reply brief that the district court should have considered whether Argentina and Caja were alter egos at some later time, such as after Argentina issued the official resolutions. *See* Reply Brief 27. But because TIG did not raise this argument in its opening brief, it is forfeited. *See Herron v. Fannie Mae*, 861 F.3d 160, 165 (D.C. Cir. 2017).

In sum, we agree with the district court's conclusion that TIG failed to meet its burden of asserting facts to demonstrate that Caja and Argentina were alter egos as a basis to impute Caja's actions to Argentina and to thus form a basis for Argentina's waiver of sovereign immunity.

**B**

TIG also argues that the district court abused its discretion by denying its request for jurisdictional discovery and a later motion for reconsideration on the alter ego issue. Both arguments fail.

TIG first contends that the district court abused its discretion in denying TIG jurisdictional discovery. Appellant's Brief 57–60. We have said that "in order to get jurisdictional discovery," the party seeking discovery "must have at least a good faith belief that such discovery will enable it to show that the court has . . . jurisdiction over the defendant." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998). We have also explained that jurisdictional discovery in a case like this one involving a claim of sovereign immunity "should be carefully controlled and limited." *Phx. Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). "A district court has broad discretion in its resolution of discovery problems that

arise in cases pending before it." *In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981).

Here, TIG did not offer the district court any explanation of what relevant facts it believed jurisdictional discovery would uncover. TIG's opposition to Argentina's motion to dismiss included two sentences on the subject that effectively attempted to reserve its right to conduct discovery on the alter ego issue if the district court ruled against it on its other theories. *See* J.A. 635. We have rejected similar efforts. *See GSS Grp. Ltd.*, 680 F.3d at 812. TIG needed to, at a minimum, explain in its opposition "what facts additional discovery could produce that would affect [the court's] jurisdictional analysis." *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994). Because TIG failed to develop and support its request, the district court did not abuse its discretion in denying jurisdictional discovery.

TIG's challenge to the district court's denial of its motion for reconsideration under Federal Rule of Civil Procedure 54(b) also lacks merit. *See* Appellant's Brief 61–67. With its motion for reconsideration, TIG submitted to the court a supplemental record that included a new declaration from its legal expert and translated versions of Argentinian laws and records which TIG contended bore on Argentina and Caja's relationship. The district court denied TIG's motion on the ground that TIG's "new" evidence was "previously available." J.A. 1113 (quoting *Parker v. John Moriarty & Assocs.*, 221 F. Supp. 3d 1, 2 (D.D.C. 2016)). TIG fails to show the district court abused its discretion. A "district court should not grant a motion for reconsideration unless the moving party shows new facts or clear errors of law which compel the court to change its prior position." *Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*, 199 F.3d 507, 511 (D.C. Cir. 2000). On appeal, TIG argues that much of its evidence in the supplemental record was "decades old and difficult to find," Appellant's Brief 62, but

makes no claim that the evidence was unavailable before the district court ruled on its alter ego theory. We therefore reject TIG's efforts to rely on its supplemental evidence, and the district court thus did not abuse its discretion when it denied TIG's motion for reconsideration on its alter ego theory.

## VI

We turn last to the 2001 judgment. Unlike the 2018 judgment naming Argentina, the 2001 judgment names Caja. But TIG also seeks to enforce the 2001 judgment against Argentina. Before the district court, Argentina raised two defenses. First, it argued that TIG needed to seek amendment of the 2001 judgment to substitute Argentina as the judgment debtor before TIG could rely on that judgment to attach Argentina's property. Second and independently, Argentina invoked its sovereign immunity and denied applicability of any of the FSIA exceptions for many of the same reasons already discussed.

The district court agreed with Argentina on the first argument and did not address the immunity defenses. *See TIG III, Part Two*, 2022 WL 3594601, at *7. The district court concluded that TIG was required to "go before the Northern District of Illinois to amend or alter the judgment before it can serve as a basis for an enforcement action against Argentina." *Id.* The court also stated that this was true even "to the extent that Argentina is the successor-in-interest to Caja and this successorship is sufficient to enforce the 2001 judgment against Argentina." *Id.*

That conclusion was incorrect. Under 28 U.S.C. § 1963, a registered judgment "shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner." This means that once, as here, a judgment is registered in another federal district court, "the judgment may be enforced there in accordance with the law of

that state as though originally rendered by that court." 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 3012 (3d ed. 2014). Federal Rule of Civil Procedure 69(a)(1) is to the same effect and provides that the procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—generally follows the procedure of the state where the federal court is located. Based on Section 1963 and Rule 69(a)(1), we see no basis for a conclusion that the Northern District of Illinois must first determine whether a judgment it issued can be amended or otherwise enforced in the District of Columbia against an entity not named in the judgment. *Cf. RMA Ventures Cal. v. SunAmerica Life Ins.*, 576 F.3d 1070, 1074 (10th Cir. 2009).

The district court here thus erred by requiring TIG to first return to the Northern District of Illinois before seeking enforcement against Argentina here. On remand, the district court must determine whether the 2001 judgment, having now been registered in D.C., may under D.C. law be enforced against Argentina on a successorship theory. Argentina remains free to raise its sovereign immunity defenses apart from this question.

## VII

For the foregoing reasons, we affirm the denial of TIG's request for jurisdictional discovery and vacate the district court's decisions granting Argentina relief from the judgment.[3]

Because we find that the arbitration exception and the implied waiver exception may permit TIG's claims, we vacate the dismissal of TIG's claims relating to the 2018 judgment.

---

[3] Because we vacate the orders granting relief from the 2018 judgment, we need not separately resolve the appeal from the denial of TIG's motion to reconsider those orders.

We also vacate the district court's decision that TIG cannot enforce against Argentina the 2001 judgment until TIG seeks amendment in Illinois. We remand to the district court for further analysis and to conduct any necessary factfinding on these issues, consistent with the instructions we have provided in this decision.

However, because the district court's decisions properly resolved several issues, on remand, TIG is precluded from advancing an alter ego theory to establish jurisdiction over Argentina under the FSIA. It is also precluded from arguing that Argentina failed to raise its immunity in a responsive pleading as a basis to apply the implied waiver exception.

*So ordered.*